GREGORY JOHN COOK, Appellant, v. THE
STATE OF NEVADA, Respondent.

No. 28111

February 26, 1998                    953 P.2d 712

*Thomas L. Stockard,* Reno, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Richard A. Gammick,* District Attorney, and *Terrence P. McCarthy,* Deputy District Attorney, Washoe County, for Respondent.

## OPINION

*Per Curiam:*

Appellant Gregory Cook (Cook) was charged with three counts of sexual assault for the alleged rape of his former domestic partner. At the conclusion of his first trial, a jury acquitted Cook of the first two counts of sexual assault, but the jury was unable to reach a verdict with respect to the third count. Thereafter, Cook was tried a second and third time on the remaining count of sexual assault. In each trial, a jury was unable to reach a verdict, and a mistrial was declared. At the conclusion of his fourth trial, a jury found Cook guilty of one count of sexual assault, and he

was subsequently sentenced to thirty years in the Nevada State Prison.

On appeal, Cook argues that his conviction should be reversed because the State's loss of material and potentially exculpatory evidence prejudiced his defense.[1] We agree.

## FACTS

Cook and the victim began dating in April 1992 and began living together in December 1992. From August 1993 until January 1994, the couple's relationship was acrimonious. In January 1994, the victim decided to permanently end her relationship with Cook. In accordance with her desires, Cook agreed to remove his personal possessions from her home on February 3, 1994.

On the evening of February 2, 1994, Cook telephoned the victim from his temporary residence in Sacramento, California, and informed her that he would arrive at her house in Reno at approximately 11:00 a.m. the next day. The victim informed Cook that she would leave the house unlocked because she would be at work. The events which transpired in the victim's home on the afternoon of February 3, 1994, were greatly disputed by Cook and the victim at trial.

According to Cook's trial testimony, the following events occurred. He arrived at the victim's home at approximately 8:00 a.m. on the morning of February 3, 1994, and began loading his possessions into a pickup truck. The victim arrived at the scene as he was loading the last of his belongings into the truck. At some point the victim asked him to come into her bedroom to help her remove an electrical cord that was stuck underneath the bed. While in the bedroom, the victim made sexual advances towards him and indicated that she wanted to engage in fellatio upon him.

Cook testified that, while he initially refused the victim's advances, he eventually acquiesced. During the time frame within which she performed consensual fellatio upon him, the victim removed her black sweater and bra. After fellating him, the victim asked him to perform cunnilingus upon her. His refusal stimulated an argument. A brief scuffle ensued during which the victim grabbed his right arm from behind and twisted it. As he

---

[1]In addition to this argument, Cook also asserts that his four trials for the same offense violated the prohibition against double jeopardy embodied within the Fifth Amendment to the United States Constitution and Article 1, § 8 of the Nevada Constitution. Additionally, Cook argues that the district court erred in admitting evidence of Cook's alleged prior and subsequent bad acts. Because we hold that Cook's conviction warrants reversal solely due to the State's loss of material and potentially exculpatory evidence, we do not reach the substance of Cook's two remaining arguments.

pulled his arm back, his elbow inadvertently struck the victim's nose, causing it to bleed.

Seeing that her nose was bleeding, Cook retrieved a wet towel from the bathroom counter, handed it to the victim, and told her to lie down on the bedroom floor. The bloodstain on the bedroom carpet was circular in shape and approximately eight inches in diameter. After the victim regained her composure, he made a telephone call to his friend in Sacramento and then gave the victim his forwarding address. At approximately 1:00 p.m., he and the victim left the scene in separate cars.

In contrast to Cook's claim that their sexual encounter was consensual, the victim testified at trial that Cook had violently forced her to engage in fellatio. The victim testified that when she arrived at her home at approximately noon on February 3, 1994, Cook appeared angry and agitated. After briefly arguing about the ownership of some minor household effects, she went into the kitchen to prepare lunch. While standing next to her microwave oven, Cook came over to her, grabbed her, shoved her into the dining room, and then punched her in the stomach.

The victim testified that following this blow, she struggled with Cook, but he managed to drag her down the hallway and into her master bedroom. Once in the bedroom, Cook shoved her onto the bed and, as he came towards her, she kicked him twice in the groin and then ran for the door in an attempt to escape. Cook managed to grab her, whereupon she fell to the floor and then noticed that her nose was bleeding. Cook then dragged her to the vanity area of her master bedroom, leaving a trail of blood on the carpet.

The victim testified that after Cook attempted to clean the blood trail, he ripped off her pants and underwear, tearing her pants. Cook then performed cunnilingus on her against her will. After approximately fifteen seconds, Cook then shoved her back onto the bed, forced her to take off her sweater and bra, and then forced her to engage in fellatio upon him. After several minutes, she asked Cook if she could get a drink of water from the bathroom in the master bedroom. When she returned, she ran for the bedroom door, but Cook managed to grab her. Because the door was between her and Cook, she slammed the door on Cook's arm, but he maintained his grip and dragged her back into the bedroom. Once back in the bedroom, Cook forced her again to engage in fellatio against her will.

The victim testified that after this incident, she put on the same black sweater that she was wearing that morning but she got dressed in a different pair of pants because her other pair were ripped as a result of the struggle with Cook. Additionally, she did not put her necklace back on because it was broken during the struggle. After Cook gave her his forwarding address, the two

departed the house together, and she returned to her place of employment.

After returning to work, the victim informed her supervisor that she had been sexually assaulted. Later that day, she met Officer Benedetti (Benedetti) of the Sparks Police Department at her home. Based on his observations of the victim's home, Benedetti testified that he was unable to find any obvious signs of struggle. Benedetti did observe one spot of blood located approximately ten feet from the end of the bed in the master bedroom and some scratches on the bedroom door. Although he took numerous photographs of the scratch marks and the blood spot, these photos were lost by the Sparks Police Department. Additionally, Benedetti placed a ruler next to the blood spot on the carpet so that the photographs would accurately depict the size and shape of the spot. However, all such photos of the blood spot and the ruler were also lost by the police department.

Along with the photos of the blood spot, Benedetti took several photographs of the victim's master bedroom, but these photos were also lost by the police department. Additionally, Benedetti took the victim's black sweater into evidence in order to perform blood and hair analysis. Benedetti testified that he did not notice any obvious signs of blood on the sweater, nor did it appear ripped or torn. However, as with the photographs, the victim's sweater was also lost by the Sparks Police Department. In addition to losing most of the evidence gathered in the investigation of this crime, the Sparks Police Department never viewed or secured the pants that the victim stated were ripped from her person.

On the evening of February 3, 1994, Cook was interviewed by Detective Torres (Det. Torres) of the Sparks Police Department. Prior to conducting the interview, Benedetti told Det. Torres that the victim had allegedly scratched, bit, and kicked Cook in the testicles during the struggle. Approximately twenty minutes into the interview, Det. Torres noticed that the tape recorder was not working, and thus no recording of Cook's initial interview was made.

At the conclusion of the interview, Det. Torres asked Cook to take off his shirt so that he could photograph Cook's upper body. Det. Torres testified that Cook had a circular bruise, comparable to the size of a silver dollar, on his right bicep just above the elbow. Det. Torres testified that this was the only injury that he observed on Cook's upper body. As with the other items of evidence, the photograph of Cook's circular bruise on his right arm was lost by the Sparks Police Department.

While Det. Torres knew that the victim had allegedly kicked and scratched Cook in the testicles during their struggle, Det. Torres did not ask Cook to disrobe from the waist down because

Cook did not exhibit any signs that he was suffering from an injury to his groin area. Further, while Det. Torres made a written report concerning his initial interview with Cook, Det. Torres subsequently lost this report. Det. Torres testified that he drafted a second report, based on his notes taken during the interview, approximately three and one-half months after Cook's initial interview.

At the conclusion of the interview with Det. Torres, Cook was placed under arrest. Cook went to trial on three counts of sexual assault in violation of NRS 200.366. The first jury acquitted him of two of the counts but could not reach a verdict on the third. Two more jury trials on the one remaining count ended in hung juries, and he was convicted of the one remaining count at the conclusion of the fourth jury trial.

## DISCUSSION

The loss of material and potentially exculpatory evidence by a law enforcement agency can deprive a defendant of the opportunity to corroborate his or her testimony, thereby severely prejudicing the defense. The State recognized the critical nature of the lost evidence as indicated by the remarks of the prosecutor during closing argument.[2] There is little doubt that the lost evidence was both relevant and material.

Cook argues that much of the lost evidence was exculpatory as well and points to specific items of lost evidence that would have aided his defense:

1. The photographs depicting the condition of the victim's bedroom: Because the victim described a violent struggle which culminated in her bedroom, Cook argues that photos taken by the police, which demonstrated that the condition of her bedroom was inconsistent with the type of struggle which she described, would have bolstered his argument that such a struggle did not take place.

2. The photographs depicting the blood spot on the carpet: While the victim and Benedetti testified that the blood spot on the carpet had striations through it due to the victim being dragged across the floor, Cook testified that the blood spot was circular in

---

[2]During closing argument, the State argued:

> You will be determining justice in this case by your verdict. Some of you may actually be wishing that you could do another type of justice in this case, that you could sign another type of verdict other than Mr. Greg Cook's guilt in this matter, one that says the Sparks Police Department is guilty of serious misconduct and overwhelming embarrassing human errors in this matter. Let me be the first to suggest that this is absolutely true and correct. Let me be the first to tell you that heads will roll at Sparks Police Department over their conduct in this case.

shape, approximately eight inches in length, and confined to one area of the carpet. Cook argues that these photographs would have proven that he did not violently attack the victim and drag her several feet across the carpeted floor.

3. The photographs depicting the bruise on Cook's arm: Cook argues that the loss of such photos deprived him of the opportunity to rebut or impeach the victim's testimony that the bruise on his arm was caused by her act of slamming a door on his arm during her purported escape attempt.

4. Det. Torres' written report taken during Cook's initial interview on February 3, 1994: Cook argues that the contemporaneous report of his voluntary statement, given by Cook before he was aware of any of the victim's specific allegations, could have been used to corroborate Cook's trial testimony.

5. The victim's initial statement to the police: Cook argues that the victim's initial statement may have been inconsistent with portions of her trial testimony as evidenced by the fact that her initial statement led police to charge Cook with only one count of fellatio, and not two.[3] However, because this report was lost by the Sparks Police Department, Cook argues that he was denied the opportunity to show inconsistencies between the victim's initial statement and her trial testimony.

6. The victim's sweater: Cook argues that the victim's sweater was the critical piece of evidence that was lost by the Sparks Police Department. The victim testified that she was wearing the sweater when the violent struggle with Cook occurred and that some of her blood may have dripped onto her sweater. Cook testified that the victim's nose began to bleed after the fellatio, when she was not wearing her sweater. Accordingly, Cook argues that the sweater was both material and exculpatory evidence because it would have supported his testimony.

A conviction may be reversed when the state loses evidence if the defendant is prejudiced by the loss or the state acted in bad faith in losing it.[4] Sparks v. State, 104 Nev. 316, 319, 759 P.2d 180, 182 (1988). To establish prejudice, the defendant must show that it could be reasonably anticipated that the evidence would have been exculpatory and material to the defense. Boggs v. State, 95 Nev. 911, 913, 604 P.2d 107, 108 (1979).

In State v. Havas, 95 Nev. 706, 707, 601 P.2d 1197, 1197 (1979), the pants and undergarments of an alleged rape victim were lost by the police and were thus unavailable for inspection

[3]Cook was not charged with a second count of fellatio until after the victim testified at a preliminary hearing held on March 18, 1994.

[4]Cook's prior counsel stipulated during trial that the State did not lose or destroy the evidence in bad faith.

by the defense.[5] Although the alleged victim testified during a preliminary examination that her clothes were not torn during the alleged rape, the defendant wanted to inspect the items to demonstrate lack of force. *Id.* at 708, 710, 601 P.2d at 1198, 1199. In response, the State argued that the garments were not material because a showing of physical force was not necessary to complete the act of forcible rape. *Id.* at 708, 601 P.2d at 1198.

While indicating that the defendant bore the burden of showing that the lost evidence was material and exculpatory, we determined that the evidence was indeed material to the guilt or innocence of the defendant and thus the prosecution should have preserved the evidence in question. *Id.* In affirming the dismissal of forcible rape charges against the defendant, we concluded:

> The crime of rape is rarely perpetrated in the presence of witnesses other than the defendant and the victim and great reliance must be placed on the testimony of the victim, and, if given, the defendant. Thus, the presence or absence of other evidence which would support or refute the testimony of the involved parties has the potential for great significance.

*Id.*

Based on our decisions in *Sparks, Boggs,* and *Havas,* we conclude that the evidence which was lost by the Sparks Police Department unduly prejudiced Cook's case. From our review of the record, Cook has made the requisite showing of prejudice by demonstrating that the lost items of evidentiary value could have been reasonably anticipated to be both material and exculpatory. Due to the State's negligent loss of evidence, Cook's ability to defend himself was severely undermined. Accordingly, the State's failure to preserve such evidence violated Cook's right of due process and mandates reversal of his conviction and sentence.[6]

---

[5]In Deere v. State, 100 Nev. 565, 688 P.2d 322 (1984), we overruled State v. Havas, 95 Nev. 706, 601 P.2d 1197 (1979), to the extent that the *Havas* holding formulated a per se rule that a rape victim's undergarments were always material and potentially exculpatory evidence. Rather, in *Deere,* we reiterated that "[t]he materiality and potentially exculpatory character of lost or destroyed evidence must be determined on an *ad hoc* basis on the facts of each particular case." *Deere,* 100 Nev. at 566-67, 688 P.2d at 323.

[6]We do not suggest that the Sparks Police Department had a duty to collect evidence. Rather, we base our holding that Cook's defense was unduly prejudiced solely on the evidence that was gathered and then subsequently lost by the Sparks Police Department.

## CONCLUSION

After carefully reviewing the appellant's arguments, we conclude that Cook has established prejudice by showing that the lost items of evidentiary value could have been reasonably anticipated to be both exculpatory and material. The State's mishandling and loss of evidence severely prejudiced Cook's defense. Accordingly, we reverse Cook's conviction and dismiss this case.