RONALD LAWRENCE MORTENSEN, Appellant, *v.*
THE STATE OF NEVADA, Respondent.

No. 30855

RONALD LAWRENCE MORTENSEN, Appellant, *v.*
THE STATE OF NEVADA, Respondent.

No. 33293

September 27, 1999 986 P.2d 1105

[Rehearing denied December 27, 1999]

*Frank J. Cremen,* Las Vegas, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart L. Bell,* District Attorney, and *James Tufteland* and *William T. Koot,* Chief Deputy District Attorneys, Clark County, for Respondent.

Before MAUPIN, AGOSTI and BECKER, JJ.

## OPINION[1]

By the Court, AGOSTI, J.:

On December 27, 1996, Ronald Mortensen ("Mortensen"), an officer with the Las Vegas Metropolitan Police Department ("LVMPD"), celebrated his thirty-first birthday at a Las Vegas drinking establishment. Chris Brady ("Brady"), another LVMPD officer, was among the revelers.

Around midnight, the celebration ended. Mortensen's wife went home, while Mortensen and Brady left in Brady's blue 1974 Dodge pickup truck. Brady and Mortensen then drove away. Brady drove and Mortensen occupied the passenger's seat. Prior to their departure, Mortensen gave his wife his fanny pack, but removed from it his off-duty weapon, a .380 Sig Sauer gun.

Brady and Mortensen ultimately drove into an alley abutting 537 McKellar Circle, an area known for gang activity, where a

---

[1]This court previously denied consolidation of these appeals. After argument and complete briefing, the court has determined that these appeals be consolidated for the purpose of disposition only. *See* NRAP 3(b).

group of people had gathered. It is undisputed that the passenger side of Brady's truck faced the group. Witnesses saw a handgun appear in the passenger's window, after which six shots were fired. One man, Daniel Mendoza, was fatally wounded. The truck then pulled away and left the area.

Following the incident, Mortensen and Brady went to PT's Lounge in Las Vegas, a bar frequented by off-duty police officers. Later, Brady drove Mortensen home.

Brady claims that the next morning, Saturday, he discovered Mortensen's Sig Sauer in the pickup. Brady removed the bullets from the magazine and the chamber, placed the gun in his bathroom cabinet and went fishing. On Sunday morning, Brady contacted his father, who was also a police officer. Brady, accompanied by his father, then drove to the police station, where Brady gave a statement identifying Mortensen as the shooter.[2] Brady also turned over Mortensen's Sig Sauer. That evening, Mortensen was arrested. The State treated Brady as a witness rather than as an accessory. Thus, he was never arrested or charged in connection with his role in the affair.

During the investigation, the police went to Brady's apartment to retrieve the truck and Brady's gun, a .38 Taurus revolver. The truck was towed to a crime lab where the passenger side was examined by a criminalist. The truck was returned to Brady a day or two later. Mortensen's gun was checked for fingerprints. Two identifiable prints left by Mortensen were recovered from the slide of the weapon.

On January 15, 1997, Mortensen appeared at a bail hearing before a justice of the peace. Mortensen's counsel made an oral request for Brady's truck and clothing. Although noting that it had no jurisdiction over Brady's property, the court requested that the State ask Brady not to destroy any evidence.

On January 23, 1997, Mortensen was arraigned in the district court. At that hearing, Mortensen made another oral request for Brady's truck and clothing. The court told Mortensen that he would have to obtain those items through his own resources. Sometime within the next few weeks, Mortensen was able to obtain both the truck and the clothing. The clothing had been laundered. The custom seat that had been in the truck on the night of the shooting had been removed and sold. The truck had been repainted, the tint had been removed from the side windows, and the clutch and carburetor had been adjusted.

At a pre-trial hearing, on April 24, 1997, the State claimed that no additional discovery was forthcoming.

---

[2]Brady claims that he contacted the police, after learning from reading newspaper accounts of the incident, that someone had been shot.

On April 28, 1997, the first day of trial, Mortensen received copies of two reports from Torrey Johnson ("Johnson"), the State's firearms expert. The first report, dated April 25, 1997, indicated that, on February 18, 1997, Johnson had examined Brady's truck and concluded that a dent in the floorboard was not made by a bullet strike. The report also indicated that on April 23, 1997, Johnson examined two bullet strikes at the murder scene, one on an electrical box and another on a laundry room doorway, and concluded that the laundry room bullet had been travelling slightly upwards. Johnson also concluded that both bullets came from Mortensen's gun. The second report, dated April 28, 1997, indicated that on April 25, 1997, Johnson examined a piece of sheet metal from the murder scene and concluded it had been struck by a bullet from Mortensen's gun which was travelling perpendicular to the surface of the sheet metal.

The State called several eyewitnesses at trial. Five witnesses gave similar descriptions of the shooter, describing him as a large, white male who wore glasses and was the passenger in the truck. Two of those witnesses specifically identified Mortensen as the shooter, and one of those witnesses stated that the truck moved during the shooting.

It was established that Mortensen was six feet, two inches tall and weighed 220 pounds, while Brady was five feet, nine inches tall and weighed 165 pounds. It was also established that Mortensen wore glasses on the night of the shooting.

No witnesses identified Brady or anyone else as the shooter.

Brady was called as a State's witness. He testified that the center console of the custom truck seat was lowered at the time of the shooting, and therefore it would have been impossible for him to reach across the truck cab in order to fire a gun out of the passenger window. However, Brady did admit that he drew his weapon, a Taurus revolver, immediately after Mortensen drew his gun. Brady claimed he pointed the Taurus out the passenger window, but did not fire. Brady testified that he pressed down on the truck's accelerator, after shooting commenced.

At this point in the trial, Mortensen sought to question Brady about two prior incidents, which had resulted in an internal affairs investigation of Brady.[3] The incidents resulted in, at most, minor

---

[3]At oral argument, the parties clarified the two incidents which prompted the internal affairs investigation of Brady. In the first, Brady allegedly pulled a gun on a motorist who refused to stop. In the second, Brady allegedly knocked down a person who refused to leave a casino.

In the parties' briefs, Mortensen alleged that Brady was involved in eight incidents in the summer of 1995 which resulted in internal affairs complaints. In one incident, Brady allegedly put a gun to the head of a man who looked at Brady in a peculiar way.

internal corrective action. The court sustained the State's objection to this line of inquiry.

The State called Johnson as an expert witness. Johnson identified Mortensen's Sig Sauer as the murder weapon. He testified that the Sig Sauer must have been fired from outside the truck cab, due to the ejection characteristics of the gun, and the fact that all the shells were found on the ground at the crime scene. Johnson also gave an opinion with regard to the trajectories of the bullets fired at the crime scene. Specifically, Johnson analyzed three bullet strikes: one located on a piece of sheet metal; another on a metal electrical box; and a third through a glass window and into a laundry room door. Johnson testified that in his opinion, based on the location of the bullet strikes, the gun moved at least six feet during the shooting. Shortly thereafter, Mortensen moved for a mistrial, claiming that the State failed to provide notice that Johnson would testify that the truck moved while the shots were fired. The motion was denied.

Mortensen testified in his own defense. He admitted he was in the passenger seat on the night of the shooting, but claimed that Brady was the shooter. Mortensen testified that Brady suddenly retrieved the Sig Sauer from underneath Mortensen's buttocks, reached across the cab of the truck and fired at the group of people outside. Then, according to Mortensen, Brady indicated he would dispose of the gun, and that Brady placed it in a secret compartment in the center section of the custom truck seat. Mortensen also testified that he asked Brady why he had fired the shots and that Brady then called himself "evil."

Brady's truck was introduced into evidence. Although Brady had removed the custom seat after the shooting, the defense was able to reacquire the same seat and place it in the truck for demonstration purposes at trial. Members of the jury observed the truck with the custom seat in place and were able to sit inside the truck.

On May 14, 1997, the jury found Mortensen guilty of first-degree murder with the use of a deadly weapon. He was sentenced to two consecutive terms of life imprisonment without the possibility of parole.

## DISCUSSION

### Applicability of NRS 48.045(2)

Mortensen argues that Brady's prior bad acts, primarily two incidents reported to the internal affairs division of the police department, should have been admitted notwithstanding NRS 48.045(2):

Evidence of other crimes, wrongs or acts is not admissi-

ble to prove the character of a *person* in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

(Emphasis added.)

Mortensen asserts that NRS 48.045(2) applies only to an accused and not to a witness; that the prior bad acts tend to identify Brady as the shooter; and that the prior bad acts show a pattern of hot-headed, impulsive and brutish behavior by Brady. We hold that no abuse of discretion was shown with regard to the district court's exclusion of references to Brady's prior bad acts.

The admissibility of prior bad acts evidence is within the discretion of the trial court, whose "decisions will not be disturbed on appeal unless manifestly wrong." Crawford v. State, 107 Nev. 345, 348, 811 P.2d 67, 69 (1991).

The plain language of NRS 48.045(2) uses the term "person," rather than "defendant," or "accused." In Nevada, "words in a statute should be given their plain meaning unless this violates the spirit of the act." McKay v. Board of Supervisors, 102 Nev. 644, 648, 730 P.2d 438, 441 (1986).

Had the legislature intended NRS 48.045(2) to apply only to an accused, the word "person" would not have been used. For example, NRS 48.045(1) specifically uses the terms "accused," NRS 48.045(1)(a), "victim," NRS 48.045(1)(b) and "witness," NRS 48.045(1)(c). This choice of words demonstrates that, had the legislature intended NRS 48.045(2) to apply only to an accused, it would have clearly stated so.[4]

Moreover, the identity exception to NRS 48.045(2) generally involves situations where a positive identification of the perpetrator has not been made, and the offered evidence establishes a signature crime so clear as to establish the identity of the person on trial. *See* Canada v. State, 104 Nev. 288, 756 P.2d 552 (1988); Mayes v. State, 95 Nev. 140, 591 P.2d 250 (1979).[5]

---

[4]In support of his argument, Mortensen cites to Cipriano v. State, 111 Nev. 534, 894 P.2d 347 (1995), *overruled on other grounds by* State v. Sixth Judicial District Court, 114 Nev. 739, 964 P.2d 48 (1998), and *Crawford,* 107 Nev. at 345, 811 P.2d at 67. However, neither *Cipriano* nor *Crawford* stands for the proposition that the exclusion of prior bad acts applies only to an accused.

[5]The incidents to which Mortensen refers took place well over a year prior to the commission of this offense. The trial court acted well within its

NRS 48.045(2) clearly states that evidence of other acts is not admissible to prove the person acted in conformity with those acts. Yet, by offering the evidence to establish that Brady is hotheaded, impulsive and brutish, this is exactly what Mortensen attempted to do. Mortensen cannot offer evidence of Brady's prior bad acts to show that Brady acted in conformity with that type of behavior on the night of the shooting. We conclude that the probative value of this evidence on the issue of identity is marginal at best and is outweighed by its prejudicial effect. Thus, the district court properly refused to allow the introduction of Brady's prior bad acts to show a pattern of behavior.[6]

*Admission of expert testimony*

Mortensen moved for a mistrial based on the State's failure to provide Mortensen with Johnson's reports prior to the trial. Mortensen argues that the district court wrongfully denied the motion, thus allowing Johnson to testify that Brady's truck moved during the shooting. We disagree.

Denial of a motion for mistrial can only be reversed where there is a clear showing of an abuse of discretion. Sparks v. State, 96 Nev. 26, 30, 604 P.2d 802, 804 (1980).

The admissibility of expert testimony is within the discretion of the trial court. Emmons v. State, 107 Nev. 53, 56, 807 P.2d 718, 720 (1991).

Mortensen argues that, at the pre-trial hearing, held April 24, 1997, the State misrepresented the existence of Johnson's ongoing experiments by stating that discovery was complete. Mortensen

---

discretion in its exclusion of the evidence on the issue of identity and modus operandi (the latter theory was offered by appellant at oral argument).

[6]Mortensen also argues that his Sixth Amendment right to confrontation and his Fourteenth Amendment right to due process were denied when he was not allowed to question Brady concerning Brady's prior bad acts. Thus, Mortensen argues that NRS 48.045(2) is unconstitutional. We disagree. Neither the Sixth nor the Fourteenth Amendment was violated in this case. Mortensen was able to effectively cross-examine Brady. Furthermore, Brady's prior bad acts do not exculpate Mortensen. For these reasons, Mortensen's constitutional rights were not denied under NRS 48.045(2).

Mortensen argues that the prior incidents were also admissible for impeachment purposes. We perceive no abuse of discretion in refusing admission of this evidence for this purpose. Brady's credibility was more than adequately litigated before the jury.

argues that as a result of this misrepresentation, reversal is warranted under McKee v. State, 112 Nev. 642, 917 P.2d 940 (1996). In *McKee,* the State obtained a photograph of the defendant holding a baggy full of drugs. Rather than provide the defense with a copy of the picture, the State kept it a secret in the hope that it could be used to impeach the defendant. The defendant denied using drugs and, on cross-examination, was impeached with the photograph. This court ordered a new trial based on the unfair and prejudicial actions of the State. *Id.* at 648, 917 P.2d at 944.

The State's actions in *McKee* were more egregious than the State's actions in the present case. The photograph in *McKee* showed the defendant holding drugs, while Johnson's testimony concerned the truck and did not directly implicate Mortensen. Further, nothing in the record suggests that the State intentionally concealed Johnson's reports from Mortensen. The State did not receive Johnson's reports until April 25, 1997, at which time they were forwarded to Mortensen. We conclude that any prejudice caused by the late delivery of the reports was harmless. Even if Mortensen were surprised when Johnson testified that the truck moved during the shooting, the movement of the truck was not, in any respect, determinative of the ultimate verdict. Five eyewitnesses either directly or indirectly identified Mortensen as the shooter. The overwhelming evidence of Mortensen's guilt militates against a conclusion that harm resulted from the delayed disclosure of the report. Finally, Mortensen was afforded the opportunity to cross-examine Johnson regarding the report and did so. For these reasons, the district court did not abuse its discretion when it denied Mortensen's motion for a mistrial.

 █

Citing Wrenn v. State, 89 Nev. 71, 506 P.2d 418 (1973), Mortensen also argues that Johnson's testimony was speculative and uninformed and should not have been admitted. We disagree.

In *Wrenn,* a defense expert sought to testify concerning the elevation of a rifle when it was fired. The trial court ruled that the expert could not testify. This court affirmed because the expert attempted to recreate an event which had occurred two years prior, and had relied on several assumptions not supported by the actual facts of the case. *Id.* at 73-74, 506 P.2d at 419-20.

Here, there is nothing to suggest that Johnson made any unsubstantiated assumptions in the conduct of his experiments. These experiments were also undertaken within months of the shooting. It is also undisputed that Johnson was an expert in firearms examination and that he was competent to give testimony regarding bullet trajectories. For these reasons, the district court did not abuse its discretion when it allowed Johnson to testify regarding bullet trajectories. *See* McNair v. State, 108 Nev. 53, 56, 825 P.2d 571,

573 (1992) (reiterating that "it is the jury's function, not that of the court, to assess the weight of the evidence and determine the credibility of witnesses").

### Preservation of evidence

Mortensen argues that his due process rights were violated by the State's failure to preserve evidence and provide evidence subject to discovery. Thus Mortensen claims the case should be reversed and the charge dismissed. Specifically, Mortensen contends that the State should have acquired Brady's truck and clothing and provided them to Mortensen before they could be altered. This argument is without merit.

To establish a violation of due process " 'resulting from the state's loss or destruction of evidence, a defendant must demonstrate either (1) that the state lost or destroyed the evidence in bad faith, or (2) that the loss unduly prejudiced the defendant's case and the evidence possessed an exculpatory value that was apparent before the evidence was destroyed.' " Sheriff v. Warner, 112 Nev. 1234, 1239-40, 926 P.2d 775, 778 (1996) (quoting State v. Hall, 105 Nev. 7, 9, 768 P.2d 349, 350 (1989)); see also Daniels v. State, 114 Nev. 261, 267-68, 956 P.2d 111, 115 (1998).

Mortensen fails to show that the State acted in bad faith when it failed to provide Brady's truck or clothing to Mortensen. The LVMPD obtained Brady's truck shortly after the shooting, conducted an examination, took pictures and returned the truck to Brady. At that time, the State did not consider Brady a suspect, nor did it know that Mortensen would contend that Brady was the shooter.[7] Thus, the LVMPD was not required to provide the truck or the clothing to Mortensen.

Mortensen also argues that the State acted in bad faith by ignoring a justices' court's request, at a bail hearing, that the State not destroy any evidence. However, the justices' court did not order the State to produce the truck and clothing, it merely requested that the State ask Brady not to destroy evidence. Additionally, the

---

[7]Mortensen claims that the State was notified of the defense theory by way of a letter written to the State in January of 1997. However, the January letter does not appear in the record.

Mortensen also claims that a motion in limine filed by the State on March 31, 1997, showed that the State was aware of the defense's theory. Even if the motion did show that the State was aware of Mortensen's theory, it would only show that the State was on notice at the end of March, but not that the State was on notice in January, when the truck was examined. Thus, the statement does not demonstrate that the State was aware of Mortensen's theory at the time the evidence was altered.

justices' court correctly stated that it did not have jurisdiction over Brady's property. State of Nevada v. Justice Court, 112 Nev. 803, 806, 919 P.2d 401, 402 (1996) (concluding that ''the justice[s'] court does not have the authority to order criminal discovery prior to a preliminary hearing''). The bail hearing took place on January 15, 1997, and the preliminary hearing was scheduled for January 24, 1997. Thus, the justices' court did not have jurisdiction to grant the relief sought by Mortensen.

For these reasons, we conclude that the State did not act in bad faith when it did not preserve and provide Brady's truck and clothing to Mortensen.[8]

Furthermore, Mortensen has failed to demonstrate that he was unduly prejudiced by any alterations made to Brady's truck or clothing.[9] To establish prejudice, Mortensen ''must show that it could be reasonably anticipated that the evidence would have been exculpatory and material to the defense.'' Leonard v. State, 114 Nev. 639, 654, 958 P.2d 1220, 1232 (1998) (citing Boggs v. State, 95 Nev. 911, 913, 604 P.2d 107, 108 (1970)).

Although the custom bench seat present in the truck on the night of the shooting was removed and sold by Brady, Mortensen was able to acquire the seat and place it in the truck for the trial. The jury was able to observe the truck with the custom seat, and jury members were allowed to sit in the truck. Thus, they could assess the credibility of Brady's statement that he could not reach across the cab sufficiently to have discharged Mortensen's weapon as described by eyewitnesses.[10] Mortensen has, therefore, not demonstrated that the custom seat, prior to its removal, possessed an exculpatory value any greater than was apparent from the reinstalled seat. Thus, the removal and subsequent reinstallation of the custom seat did not prejudice Mortensen.

Although Brady's truck was repainted after the shooting, there was never a dispute that Brady's truck was the vehicle from which the shots were fired. Thus, the repainting of the truck did not prejudice Mortensen.

[8]The significance of any perceived failure by the State to preserve this evidence and any inferences arising therefrom was more than adequately conveyed to the jury.

[9]Mortensen also argues that his conviction should be reversed pursuant to Cook v. State, 114 Nev. 120, 953 P.2d 712 (1998). In Cook, we reversed a defendant's conviction for sexual assault where the police had lost a substantial amount of evidence, including all photographs of the crime scene and the victim's sweater. The police also failed to collect the victim's pants, which were allegedly torn during the assault. Because the police in the present case have not actually lost any evidence, Cook is not applicable, and Mortensen's argument is thus without merit.

[10]At trial, it was undisputed that Mortensen's weapon fired the fatal shot.

Similarly, the removal of the window tint did not prejudice Mortensen since the eyewitnesses to the shooting observed the shooter either through the rolled down passenger window or through the untinted, front window.

Mortensen argues that the adjustment of the clutch and carburetor prevented him from demonstrating that the truck, if left in gear, would roll forward if the driver's foot were removed from the brake, *i.e.,* if Brady's foot came off the brake while he leaned across the truck cab to fire out the passenger window. However, Mortensen established this proposition at trial when a defense investigator testified that Brady's truck would roll forward if the driver removed his foot from the brake. In any case, both the State's and the defense's theories relied on the movement of the truck. The State argued that Brady began to drive once Mortensen fired his gun, while the defense argued that the truck moved when Brady leaned over to shoot. Since the jury heard testimony regarding the tendency of the truck to move when the brake was released, we conclude that Mortensen was not unduly prejudiced by the adjustment of the carburetor and clutch.[11]

Mortensen argues that since Brady's clothing was laundered before it could be examined, it was impossible to determine whether it contained powder residue which would have suggested that Brady was the shooter. However, we have held that " '[i]t is not sufficient that the showing disclose merely a hoped-for conclusion from examination of the destroyed evidence.' " *Warner,* 112 Nev. at 1240, 926 P.2d at 778 (quoting *Boggs,* 95 Nev. at 913, 604 P.2d at 108 (citation omitted)). "[M]ere assertions by the defense counsel that an examination of the evidence will potentially reveal exculpatory evidence does not constitute a sufficient showing of prejudice." *Warner,* 112 Nev. at 1242, 926 P.2d at 779. Because there is nothing, other than Mortensen's contention, to suggest that powder residue ever existed or was washed out of Brady's clothing, Mortensen was not unduly prejudiced by the laundering of the clothing. Again, the inference that Brady was trying to conceal his involvement by destroying evidence was argued at length as part of Mortensen's defense strategy. That the

---

[11]The district court sustained the State's objection when Mortensen attempted to establish how quickly the truck would move if the brake were released. At no other time during the trial did Mortensen attempt to establish the truck's rate of acceleration. Further, both the State and defense theories relied on the movement of the truck. The fact that the truck moved, not how fast it moved, was relevant to both parties. Thus, Mortensen was not unduly prejudiced when the court refused him permission to establish the rate of acceleration.

evidence was lost and might conceivably have provided Mortensen with favorable evidence is not grounds for dismissing the charge against him.

## Newly discovered evidence

Fourth, Mortensen argues that the district court wrongfully denied his motion for a new trial based on newly discovered evidence. He makes this argument in each of his appeals.[12] For convenience, each appeal will be addressed in turn.

### Docket No. 30855

Sometime in early 1996, Mortensen and Brady were involved in the arrest of a woman named Carye Morris. Morris subsequently alleged that Brady coerced her into performing an illicit sexual act upon him during transport to the Clark County Detention Center. This information was provided to Mortensen's counsel during the trial but, because of what were perceived as serious credibility problems, counsel decided not to use Morris as a witness. However, after the verdict, it was learned that, in addition to the sexual misconduct, Morris also alleged that Brady explained his behavior towards her by stating that he was "evil" or that he was "an evil man." Mortensen argues that Brady's statement to Morris corroborates Mortensen's statement at trial, that Brady described himself as "evil" after the shooting. Mortensen argues that Morris's statement is circumstantial evidence of Brady's guilt and thus warrants a new trial. We disagree.

To establish a claim for a new trial based on newly discovered evidence, the defendant must show that the evidence is

> newly discovered; material to the defense; such that even with the exercise of reasonable diligence it could not have been discovered and produced for trial; non-cumulative; such as to render a different result probable upon retrial; not only an attempt to contradict, impeach, or discredit a former witness, unless the witness is so important that a different result would be reasonably probable; and the best evidence the case admits.

Sanborn v. State, 107 Nev. 399, 406, 812 P.2d 1279, 1284-85 (1991) (footnote omitted). The grant or denial of a new trial based

---

[12]Docket No. 30855 was Mortensen's direct appeal from his conviction and from denial of a motion for a new trial. Subsequent to his conviction, Mortensen made another motion for a new trial, which was denied and is the basis of Docket No. 33293.

on newly discovered evidence is within the discretion of the trial court and will not be reversed on appeal absent an abuse of that discretion. *Id.* at 406, 812 P.2d at 1284.

Morris's statement would not in any probability produce a different result upon retrial. The statement has no connection to the circumstances of Mendoza's murder. It neither exculpates Mortensen nor inculpates Brady. Further, its admissibility, argued by Mortensen as justified pursuant to NRS 48.045(2), is questionable. Finally, Morris changed her story about her arrest several times, and it is unlikely that her testimony, if admitted, would have had any persuasive value with a jury. For these reasons, we conclude that the district court did not abuse its discretion when it denied Mortensen's motion for a new trial based on newly discovered evidence.[13]

*Docket No. 33293*

Subsequent to his conviction, Mortensen filed a motion for a new trial based on three items of newly discovered evidence.

First, Mortensen claims that LVMPD Officer Bill Butler heard Brady refer to himself as "evil" in Officer Butler's presence. We conclude that Officer Butler's statement would not render a different result probable upon retrial for the same reasons as set forth in the discussion of Carye Morris's statement.

Second, Mortensen claims that a letter and two notes written by Torrey Johnson, the State's firearms expert, justify a new trial.

The letter was addressed to the district attorney and explained that Johnson changed the scale of certain transparency exhibits after showing them to defense counsel. The letter also expressed concern regarding whether the jury understood a visual aid, and whether the jury understood that Johnson did not form an opinion regarding the position of the truck or the murder weapon, but did form an opinion that the truck was moving while the shots were fired.

The notes were dated April 29, 1997, and May 2, 1997. Mortensen claims that these notes show that Johnson felt that a bullet from Mortensen's gun may not have been powerful enough to inflict the type of wound found on Mendoza's body, and thus suggest the possibility of a third gun.

---

[13]The thrust of Mortensen's arguments concerning evidence against Brady is that if Brady is responsible for the killing, then Mortensen is innocent. However, evidence of Brady's complicity does not, in any event, equate with evidence of Mortensen's innocence.

We conclude that even if the letter shows Johnson provided confusing testimony, the introduction of the letter at a new trial would simply be an attempt to discredit Johnson. This impeachment is not so important that a different result would be reasonably probable if admitted since the letter did not contradict or refute any of Johnson's trial testimony.

Similarly, we conclude that Johnson's notes would not be likely to render a different result probable on retrial. Mortensen testified that his .380 Sig Sauer was the murder weapon. Thus, the possible existence of a third gun would not change the result of the trial. Furthermore, it is not reasonably probable that any impeachment of Johnson with the notes would render a different result if admitted.[14]

Third, Mortensen argues that a new trial is warranted based on the testimony of LVMPD Officer Marc Barry before a federal jury on July 28, 1998, well after Mortensen's conviction. Barry testified that Brady "had mentioned several times the fact about going and doing a drive-by or something like that nature." Barry testified that Brady made this statement approximately six different times. The statements were made approximately one year prior to Mendoza's death.

We conclude that this evidence was not discoverable with reasonable diligence. Defense counsel received an anonymous phone call during the trial, which roughly suggested the contents of Brady's statements to Barry. However, Barry denied knowledge of any such statements when contacted by an investigator retained by the defense. Barry also denied knowledge of the statements when contacted by the district attorney. Thus, Mortensen exercised due diligence but was unable to confirm whether Barry had knowledge of any such statements made by Brady.

We conclude that Barry's testimony regarding Brady's statements would not be such as to render a different result on guilt or innocence probable upon retrial. The only dispute over the identity of the person who fired the fatal shot was between Brady and Mortensen.

All of the eyewitnesses testified that the passenger was the actual shooter. It is undisputed that Mortensen was the passenger. Witnesses also provided physical descriptions of the shooter, which were consistent with Mortensen's appearance. It is also undisputed that the murder weapon was Mortensen's off-duty Sig Sauer. Numerous shell casings from Mortensen's gun were found in the street suggesting that the fatal shots were fired with the

---

[14]We also note that Johnson never testified at trial regarding Mendoza's wound, nor did Johnson give an opinion on wound size.

weapon having been pointed and discharged from a position outside of Brady's truck as described by the eyewitnesses. Additionally, no evidence was ever developed that Mortensen pointed another weapon out of the truck window while Brady fired the fatal shots.[15]

Certainly, the jury heard Brady concede that it was his idea to commence a pattern of citizen harassment that night. The jury heard Brady concede that he made the choices of where to drive to conduct this harassment until Mortensen suggested they turn into McKellar Circle. The same jury also heard Brady's admission that he advised Mortensen to keep quiet and that he destroyed or modified what might have been important evidence. Further, Brady's admissions exposed him to the possible commencement of separate state and/or federal proceedings against him and, thus, were against his penal interests. His participation in this drive-by shooting was in part consistent with Barry's grand jury testimony that Brady had contemplated involvement in this type of activity. Almost all of this, including the alleged effect of Brady's connections within the police department, his modification of the truck and other physical evidence, and the claim that witnesses could have been confused as to the identity of the shooter, was comprehensively argued to the jury. Brady denied ever discussing the prospect of engaging in "drive by" activities with Barry. His possible perjury on this point would demonstrate his attempt to minimize any inference of a greater degree of involvement. However, Barry's proposed testimony does not exonerate Mortensen. In sum, the evidence demonstrates that two rogue police officers were engaged in unlawful activities that led to the tragic death of Daniel Mendoza. Both were clearly subject to criminal prosecution. At Mortensen's trial the jury was the final arbiter of the truth, based upon all of the evidence submitted. Barry's proposed testimony is insufficient to satisfy the requirements for a new trial.

For all of the above reasons, we affirm the judgment of the district court.

MAUPIN and BECKER, JJ., concur.

---

[15]Brady claimed that he also drew and pointed his off-duty revolver during this incident. Mortensen never claimed that he was holding Brady's revolver. Again, however, the jury was provided with all of this information.