FRANK SALVATORE D'AGOSTINO, aka FRANK CARUSO, Appellant, v. THE STATE OF NEVADA, Respondent.

No. 21861

December 30, 1991                                    823 P.2d 283

[Rehearing denied March 3, 1992]

*Morgan D. Harris,* Public Defender and *Thomas W. Rigsby* and *Stephen J. Dahl,* Deputy Public Defenders, Clark County, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Rex Bell,* District Attorney and *James Tufteland,* Chief Deputy District Attorney and *Robert L. Langford,* Deputy District Attorney, Clark County for Respondent.

## OPINION

*Per Curiam:*

This case involves the robbery and murder of a woman in Las Vegas. Appellant, Frank D'Agostino, was convicted of the murder and sentenced to death by a jury. Appellant raises numerous issues on appeal, challenging both his conviction and sentence of death.

With respect to the guilt phase of his trial, appellant raises many issues. Upon a thorough review of those issues we conclude that each of appellant's contentions lacks merit. Accordingly, we affirm appellant's convictions. We do, however, find error with respect to appellant's penalty hearing. Thus, we reverse appellant's sentence of death and remand the case to the district court for a new penalty hearing.

The penalty hearing was contaminated by the testimony of one Michael Gaines, a prisoner who shared a cell with D'Agostino. The prosecution called Gaines as a witness to testify, over objection, that D'Agostino had admitted to Gaines several killings unrelated to the present case. According to Gaines' testimony, D'Agostino, while Gaines and D'Agostino were in jail, admitted killing some unidentified man at some unspecified time and place in New York. Gaines also testified that D'Agostino told him, while they were jailmates, that D'Agostino cut a woman's throat and threw her body off a cruise ship.

There is, of course, no way that D'Agostino could have defended himself against these kinds of unverifiable accusations. Gaines might just as well have told the jury that D'Agostino had admitted to him a number of serial, chain-saw massacres. Absent any details as to time, place and victim, an accused who must face this kind of incriminating testimony is seriously and unfairly prejudiced when the jury comes together to deliberate as to whether he should live or die.

By reason of Gaines' testimony, D'Agostino went before the penalty jury as a two-time murderer. A legally unsophisticated jury has little knowledge as to the types of pressures and inducements that jail inmates are under to "cooperate" with the state and to say anything that is "helpful" to the state's case. It is up to the trial judge to see that there are sufficient assurances of reliability prior to admitting the kind of amorphous testimony presented to keep this kind of unreliable evidence out of the hands of the jury, especially when the supposedly admitted crimes of the accused cannot be reasonably described in terms of where, when, against whom (other than "some old man in New York") and the circumstances under which the crimes were committed. More and more frequently, it seems, we are confronted with cases in which a jailbird comes forward to testify that the accused admitted to him that he not only committed the crime that he is accused of but also several other assorted crimes. We think it is time that this practice is examined more carefully.

We are not suggesting any impropriety or collusion on the part of prosecutors; but, it appears to us that a jail-house incrimination is now available in a fairly large number of homicide cases. Some limitations ought to be placed on this practice. Protections against this kind of unreliable evidence are afforded by our case law relating to proof of other crimes,[1] but it should be remembered that in death cases the proof of other crimes is intended not to show the guilt of the accused but, rather, to display the

---

[1] *See* Berner v. State, 104 Nev. 695, 765 P.2d 1144 (1988); Shults v. State, 96 Nev. 742, 616 P.2d 388 (1980).

character of the convict and to show culpability and just deserts on the party of the homicidal convict. Past criminal activity is one of the most critical factors in the process of assessing punishment, for whatever purpose punishment might be inflicted. Past misconduct relates to the criminal's blameworthiness for the charged homicide and relates, as well, to whether the jury deems it necessary for public safety to impose an irrevocable, permanent quarantine upon the murderer. The point is that past homicidal conduct of the subject of a death penalty hearing goes to the very heart of the jury's decision-making process. Improperly admitted evidence of past criminal conduct is even more damaging in a penalty hearing than it is in a guilt-determining proceeding because the past conduct goes to the substance of whether the murder should or should not be punished by death.

While past murders are relevant, even vital, to the penalty hearing when properly called to the jury's attention, unreliability demonstrated past killings are harmful in the extreme and simply cannot be overlooked by a reviewing court.

Based on the foregoing considerations, we now hold that testimony in a penalty hearing relating to supposed admissions by the convict as to past homicidal criminal conduct may not be heard by the jury unless the trial judge first determines that the details of the admissions supply a sufficient indicia of reliability or there is some credible evidence other than the admission itself to justify the conclusion that the convict committed the crimes which are the subject of the admission. Absent either criteria in the instant penalty hearing, we reverse the judgment of execution and remand to the trial court for a new penalty hearing.