FRANK SALVATORE D'AGOSTINO, APPELLANT, v. THE STATE OF NEVADA, RESPONDENT.

No. 25084

April 30, 1996                                915 P.2d 264

*Buttell & Percival,* Las Vegas; *Norman J. Reed,* Las Vegas, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart L. Bell,* District Attorney, *James Tufteland,* Chief Deputy District Attorney and *Melvyn T. Harmon,* Deputy District Attorney, Clark County, for Respondent.

*Michael Pescetta,* Las Vegas, for Amicus Curiae Nevada Appellate and Post-conviction Project.

*Kenneth C. Cory,* Las Vegas, for Amicus Curiae Nevada Attorneys for Criminal Justice.

*Laura Wightman FitzSimmons,* Las Vegas, for Amicus Curiae Nevada Trial Lawyers Association.

# OPINION

By the Court, STEFFEN, C. J.:

This is an appeal from a district court order denying appellant Frank Salvatore D'Agostino's motion for a new trial based upon newly-discovered evidence. D'Agostino contends that numerous facts unknown to him at trial indicate that a critical state witness was receiving favorable treatment from the State concerning various criminal matters, and that the nature of the treatment strongly suggests that there was an agreement between the witness and the State. D'Agostino also maintains that the key witness and the prosecution committed perjury in denying the existence of the alleged agreement, and that because the extent of the cooperation between the State and the key witness was discovered and discoverable only after trial, the district court erred in denying his motion for a new trial. For reasons which will be discussed hereinafter, we conclude that the district court properly exercised its discretion in denying D'Agostino's new trial motion, and therefore affirm.

## I.

### *PROCEDURAL HISTORY*

D'Agostino was tried and convicted by a jury of first-degree murder and sentenced to death. On direct appeal, this court affirmed the conviction, but vacated the death penalty and remanded the matter for a new penalty hearing. *See* D'Agostino v. State, 107 Nev. 1001, 823 P.2d 283 (1991). Subsequent to the disposition of his direct appeal, D'Agostino unsuccessfully sought a new trial based upon newly-discovered evidence. The instant appeal is from the district court's order denying D'Agostino's motion for a new trial.

## II.

### *FACTS*

Since our original disposition of *D'Agostino* addressed only penalty-phase error, there was no recital of the basic operative facts underlying D'Agostino's conviction for the first-degree murder of a young woman. We therefore now take the occasion to memorialize the factual background of this case as reflected by the trial evidence.

The murder occurred on April 24, 1989. Events leading up to the homicide include the arrival of the victim, Eleanor (Ellie) Panzarella, in Las Vegas on April 22, 1989. Shortly after her

arrival, she met and developed a short-lived friendship with Ruben Varela. After an evening of drinking and gambling, the two quarreled, experienced some brief, non-friendly physical contact, and Varela left alone in a taxicab. Earlier in the day, Ellie agreed to let Varela store his luggage in her newly-rented apartment before obtaining his own place. That day, Ellie and Varela met D'Agostino and his wife, Rose Lakel, who had an apartment in the same complex as the victim. Rose offered dishes and glasses to Ellie, which D'Agostino took to the victim's apartment. While there, D'Agostino told Varela and Ellie that he could obtain drugs for them if they so desired. Varela gave D'Agostino $200 for some cocaine which he was to pick up later.

After the heated argument with Varela, Ellie returned to her apartment in the company of Jack Green, who was with her as a proffered source of protection from Varela. Both Ellie and Green watched as Varela walked through the apartment complex making a disturbance, including what was later identified as a confrontation with D'Agostino regarding the cocaine he had purchased but not received. Eventually, Ellie was able to remove Varela's luggage and place it in the office of the apartment complex, where he later retrieved it. Varela left Ellie a note, and after four days, moved to Arizona where he anticipated better opportunities for purchasing marijuana in large quantities. Varela testified that he never saw Ellie again.

On the evening of April 23 and the morning of April 24, D'Agostino periodically left his wife, Rose, and spent time with Ellie in the latter's apartment. At one point during the night, D'Agostino returned to his apartment, where his wife, Rose, saw him wrap baking soda and a steak knife in a newspaper before leaving again. During the early morning hours of April 24, Renita Brown, who occupied an apartment next to Ellie's, overheard a fight in progress in the victim's apartment that included sounds of a woman calling for help, and what appeared to be someone being banged up against a wall. Brown did not have a telephone and made no attempt to contact the police or any other possible sources of help.

Rose Lakel testified that when D'Agostino returned to their apartment on the morning of April 24, he was sweating and had blood on his face, in his mouth, on his hands, and on his clothes from his waist down to and including his shoes. D'Agostino removed from the back of his pants the same steak knife that he had taken earlier. Rose noticed that there were brownish, orange pieces of "meat," blood, and a single curly, black hair on the knife. Ellie had curly, black hair. Rose also noticed that when D'Agostino removed his clothes to take a shower, he had blood around his penis and on his thighs. D'Agostino also threw on the

couch a plastic bag containing five or six hundred dollar bills and various pieces of jewelry that had not previously been among his possessions.

Over the next few days, Rose noticed that D'Agostino would return to their apartment on several occasions with a "horrible smell" on his person. Additionally, a friend, Anthony Wells, stayed with D'Agostino and Rose for several days following April 24. Both Wells and Rose saw that D'Agostino had in his possession the victim's driver's license and credit card.

On two occasions while Wells was staying with D'Agostino, he accompanied D'Agostino to Ellie's apartment where they rummaged through her belongings. During one such visit, Wells assisted D'Agostino in moving a mattress off of Ellie's body. Wells then saw D'Agostino turn on the air conditioner and spray perfume in the apartment. Wells testified that each time they went to the victim's apartment, D'Agostino gained entry by using a key. The trial evidence indicated that Varela had never been given a key to the apartment, and that D'Agostino had never received a key from either the victim or Varela.

D'Agostino also called Wells at the former's apartment, and both Wells and Rose heard D'Agostino ask Wells to make a "champagne cocktail" and throw it through Ellie's apartment window in order to eliminate evidence of their fingerprints. Although expressing agreement, Wells did not comply with D'Agostino's request. Not long after that conversation, D'Agostino and Rose took a taxicab to a convenience store where D'Agostino purchased six bottles of rubbing alcohol, matches, and cigarettes. After returning to their apartment, D'Agostino experimented with pouring alcohol on the floor and then igniting it with a burning cigarette and matches. Later, D'Agostino telephoned Wells and told him that he "done set it afire and it should be going up anytime now."

The evidence also demonstrated that on April 25, Wells and D'Agostino pawned the jewelry that D'Agostino had acquired. D'Agostino used Wells in the transaction because D'Agostino had no identification. The items of jewelry pawned for $490 included four diamond rings, a gold and diamond pendant, a pair of gold earrings, and a gold necklace. These items were identified as being jewelry that was similar or identical to that owned by the victim. Moreover, Rose testified that there were items of jewelry brought to their apartment by D'Agostino that included pieces with the initial "E" on them, which D'Agostino flushed down the toilet.

On May 2, 1989, Ellie's body was found by employees of the apartment complex. Part of the victim's body and apartment had been burned by fire fueled by rubbing alcohol. Ellie had been

stabbed numerous times in the chest and back, and later, thirty to forty percent of the surface of her body had been burned. The victim died from two stab wounds that penetrated her heart. A piece of wire was tightly wrapped around the victim's left ankle, and no jewelry or money was found in her apartment.

After noticing the police, D'Agostino and Rose left their apartment for a day and stayed in a motel. The following day, they returned to the apartment, packed their belongings, and left for Phoenix, Arizona. During their three-week stay in Phoenix, Rose gave birth to a baby girl. Eventually, the couple moved to Tampa, Florida, where they lived for several months. On February 9, 1990, the couple had a fight and Rose reported the incident to the police. During the course of reporting spousal abuse to the police, she explained, for the first time, the details of what had occurred in Las Vegas. She had delayed speaking to the authorities about the bizarre events in Las Vegas out of fear for her own life and the lives of her family. Rose gave a detailed statement to the Tampa police, and was eventually flown back to Las Vegas for further investigation of the Panzarella homicide.

While D'Agostino was incarcerated in Florida, he revealed the details of Ellie's murder to a cellmate, Michael Gaines, who thereafter informed the police and ultimately testified at D'Agostino's trial.

As noted above, D'Agostino was tried before a jury, and convicted of first-degree murder and sentenced to death. This court affirmed D'Agostino's conviction, but vacated the death sentence and remanded for a new penalty hearing. In the interim, D'Agostino now challenges on appeal the district court's denial of his motion for a new trial.

## DISCUSSION

D'Agostino contends that the district court erred in denying his motion for a new trial. The basis for D'Agostino's motion was newly-discovered evidence that would likely yield a different trial result because of the critical nature of the testimony of his wife, Rose Lakel, and the negative impact his "newly discovered" evidence would have on her credibility and the bona fides of the State's prosecution.

D'Agostino insists that the fact that several misdemeanor charges against Rose, the State's key witness, were dismissed, and a felony charge against her reduced to a misdemeanor, strongly demonstrates that an agreement between the State and Rose existed. Accordingly, D'Agostino contends that Rose Lakel, two investigators, and the prosecutor perjured themselves when each denied the existence of such an agreement. D'Agostino

therefore maintains that the trial court erred in denying his motion because this alleged agreement was never disclosed to the defense, and consequently violated his rights to due process. We disagree.

To merit a new trial, newly-discovered evidence must be evidence that could not have been discovered through reasonable diligence either before or during trial. Sanborn v. State, 107 Nev. 399, 406, 812 P.2d 1279, 1284 (1991). Although evidence that the charges against Rose were disposed of after the trial could not have been discovered prior to trial, evidence of the pending misdemeanor and felony charges was presented to the jury. This provides the basis, which the prosecutor in this case twice mentioned to defense counsel outside the jury's presence, for defense counsel's examination of Rose concerning any agreement or possible bias she may have had. *See* Davis v. Alaska, 415 U.S. 308, 317-18 (1974) (cross-examination of witness to develop potential bias is permissible). During trial, defense counsel cross-examined Rose concerning any possible agreement. Thus, we conclude that the district court did not abuse its discretion in denying D'Agostino's motion for a new trial.

Moreover, newly-discovered evidence must be "such as to render a different result probable on retrial; not only an attempt to contradict, impeach, or discredit, a former witness, unless the witness is so important that a different result would be reasonably probable." *Sanborn*, 107 Nev. at 406, 812 P.2d at 1284-85. The district court found that "since the issue of benefits received and/or promised to Rose Lakel was fully explored at trial, the information now proffered by the defense is not such as to render a different result probable upon retrial."

At trial, defense counsel and/or the prosecutor questioned Rose about the following: the witness having received a traffic warrant, a trespass warrant, a soliciting prostitution warrant, and a grand larceny warrant; whether these warrants had been actively pursued; detectives having successfully released Rose from jail five days after incarceration; Rose's previous drug history; and the circumstances and timing of secret witness funds Rose received and the possible impact of the money on her testimony. Despite this evidence suggesting cooperation with the State, Rose consistently denied that she was working with the police, that she was receiving any benefit for her testimony from the police, or that she consciously weighed the existing warrants or the potential secret witness money when she went to the authorities. Even defense counsel, outside the presence of the

jury, stated, "[m]aybe she [Rose] doesn't think she is [working with the police], but I think the inference is that Metro thinks she is." *See* Ransey v. State, 100 Nev. 277, 279, 680 P.2d 596, 597 (1984) (holding that bias of witness is always relevant to credibility); *see also* Davis v. Alaska, 415 U.S. 308, 320 (1974) (quoting Alford v. United States, 282 U.S. 687, 693 (1931)). Given the extent to which areas of cooperation between Rose and the police was explored, we are persuaded that the trial court did not abuse its discretion in finding that evidence of the dismissed warrants was not sufficiently material to render a different result probable upon retrial. McCabe v. State, 98 Nev. 604, 608, 655 P.2d 536, 538 (1982) (holding that the granting of a new trial on the grounds of newly discovered evidence is largely discretionary with the trial court and that the trial court's determination will not be disturbed unless an abuse of discretion is clearly shown).

Moreover, despite the fact that Rose Lakel was indeed a key witness for the State, we are convinced from our review of the record, that the evidence against D'Agostino was overwhelming. Although D'Agostino would have had the jury believe that he was guilty only of grand larceny and arson, and that Varela killed Ellie during a brief period when he left for a nearby store and returned to find her dead (the story communicated at trial by witness Anthony Wells related what D'Agostino told him), the evidence is clearly to the contrary. Where, as here, evidence of guilt is overwhelming, there is great reason to extend deference to the district court's discretionary denial of D'Agostino's new trial motion. *Cf.* Pacheco v. State, 81 Nev. 639, 641, 408 P.2d 715, 716 (1965) (adopting standard that the new evidence must be such as to render a different result probable on retrial. Stating that such standard calls for an exercise of discretion by the trial court).

Finally, we note that the district court, in its oral denial of D'Agostino's new trial motion, found that D'Agostino "failed to satisfy the criteria for meriting a new trial under NRS 176.515(3)." NRS 176.515(3) provides that "[a] motion for a new trial based on the ground of newly discovered evidence may be made only within 2 years after the verdict or finding of guilt."

On October 30, 1990, D'Agostino's jury returned a verdict of guilty. D'Agostino was sentenced to death on December 12, 1990, and filed his motion for a new trial on August 13, 1993, well after D'Agostino was convicted of Ellie's murder. D'Agostino nevertheless contends that the two-year statutory period commences at the conclusion of the proceedings, meaning, in a capital case, after a variety of appeals and the final

verdict and imposition of sentence, which, he contends, could not occur until after this appeal.

We disagree and conclude that the district court did not err in finding that D'Agostino did not comply with NRS 176.515(3). In Snow v. State, 105 Nev. 521, 779 P.2d 96 (1989), this court upheld the trial court's denial of a motion for a new trial, not on its merits, but on the court's conclusion that it lacked jurisdiction. *Id.* at 522-23, 779 P.2d at 97. *Snow* involved a defendant who received the death sentence and later claimed to have discovered evidence that a key witness committed perjury. This court concluded that the two-year limit was not unconstitutional because a defendant sentenced to death may bring such evidence "before the court for consideration, even after the two-year time limit imposed by NRS 176.515(3) has run, in a petition for a writ of habeas corpus." *Id.* at 523, 779 P.2d at 97. Implicitly, *Snow* contradicts D'Agostino's contention that the two-year window begins after the conclusion of all appeals in a capital case. Additionally, we conclude, as we did in *Snow,* that D'Agostino would not be foreclosed from seeking habeas relief despite the two-year period of limitations under NRS 176.515(3).

## CONCLUSION

For the reasons discussed above, we conclude that the district court did not err in denying D'Agostino's motion for a new trial. We accordingly affirm.

YOUNG, SHEARING, and ROSE, JJ., concur.

SPRINGER, J., dissenting:

I dissent in this case and would reverse the judgment of conviction because D'Agostino was denied his right to a full and meaningful cross-examination of Rose Lakel, who was the "principal witness"[1] for the prosecution.

Rose Lakel received a number of benefits from the police and the prosecution as a result of her "cooperation" as a State's witness. For example, investigating detectives in this case sought dismissal or other favorable treatment for Rose Lakel relative to a number of criminal charges pending against her. Detectives contacted one jurist and "explained the situation" to the jurist (that is to say, the situation relating to Lakel's assistance to the police in the D'Agostino case) and sought and obtained for Lakel a suspended sentence in a criminal matter. Further evidence of police intervention is seen in a letter appearing on the letterhead

---

[1]Mr. Harmon, the prosecuting attorney in this case, agreed during oral argument that Rose Lakel was the prosecution's principal witness.

of Justice of the Peace William Jansen. Judge Jansen wrote: "Officer Steve Scholl requested that the defendant (Rose Lakel) be released. She is working for Met." (Metropolitan Police Department). Further, according to prosecutor Harmon the police told Rose Lakel that there would "be secret witness money available" for her; and, during the course of this prosecution, the police paid Lakel (out of its "secret witness" fund) $1,000.00 after the warrant for D'Agostino was issued, $500.00 after she testified in the preliminary examination and $500.00 during trial. Some of the favors that the State did for its principal witness were made known to the jury, others were not. The prosecution did not advise defense counsel of all of the benefits which Lakel received from the State.

The mentioned $2,000.00 payment by the police to Rose Lakel during the course of this prosecution was disclosed to D'Agostino, and D'Agostino had an opportunity to cross-examine this witness about these police payments; however, D'Agostino was not told about a number of other instances of favors provided to Rose Lakel by the police and the prosecution by way of securing dismissals and favored sentencing treatment for her during the time that she was testifying for the prosecution in the preliminary examination and at trial.

The State argued to the trial court in its answer in opposition to the motion for new trial that "[b]eyond the consideration outlined above [the payment of $2,000] there were no promises of benefits to Rose Lakel in return for her cooperation" and that favorable dispositions of pending criminal cases against Lakel do not, in themselves, "establish that there was a pre-existing, undisclosed, under the table agreement to dispose of Rose Lakel's felony charge."

The State also argues that benefits given to or expected by a witness for the prosecution need not be disclosed to the defendant by the State if the prosecutor who is involved in the actual prosecution of the specific case has no knowledge of them. The State also continues to argue that it must have made an explicit "under the table" deal in order to violate a defendant's right to cross-examine a rewarded witness on all benefits received by that witness. Neither of these arguments is sustainable.

In my view, denial of this defendant's cross-examination rights are not dependant either on a showing of an explicit promise of benefits in exchange for testimony or upon knowledge on the part of the trial prosecutor of benefits that were not disclosed to that prosecutor by the police, the district attorney's office and others within the prosecution apparatus.

If the "prosecutor" (collectively the police and the district attorney's office) has made undisclosed promises or threats to a

witness, then the defendant is denied rights under the Sixth and Fourteenth Amendments of the Federal Constitution and under the Nevada Constitution, article 1, sections 3 and 8, whether the actual trial prosecution is aware of these facts or not.

Giglio v. United States, 405 U.S. 150 (1972), is on point. In that case the prosecutor who presented evidence to the grand jury promised a witness immunity in exchange for trial testimony helpful to the state's case. At trial, the witness testified falsely that no promises had been made to him. A different prosecutor, who claimed not to know of the previous promise, tried the case. The Supreme Court held that "whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor"; and then: "To the extent this places a burden on the large prosecution offices, procedures and regulations can be established to carry that burden and to insure communication of all relevant information on each case to every lawyer who deals with it." *Id.* at 154. In Fulford v. Maggio, 692 F.2d 354 (5th Cir. 1982), the issue under review related to statements that were in the hands of the police but which were claimed not to be known by the prosecutor. The court pointed out: "The State's duty of disclosure is imposed not only upon its prosecutor, but also on the State as a whole, including its investigative agencies." *Id.* at 358 n.2. Thus, statements held by the police are constructively held by the State's attorney when both have access to and control over documents.

> The prosecuting attorney's obligations under this standard extend to material and information in the possession or control of members of the prosecutor's staff and of any others who have participated in the investigation or evaluation of the case and who either regularly report or, with reference to a particular case, have reported to the prosecutor's office.

11 ABA, Standards for Criminal Justice, Standard 11-2.1(d) at 11-15 (2d ed. 1980).

Failure by the State to disclose all of the favors that had been given or promised to Lakel might very well have had a strong effect on the jury's assessment of the strength of the prosecution's case as it was developed by the State's "principal witness," Rose Lakel. The jury might have taken an entirely different view of her testimony if it had known all of the facts relating to her testimony. This effect on a jury is the same whether the failure to disclose was knowing or unknowing with regard to the prosecutor who actually presented the State's case.

With regard to the State's claim that it made no deals with witness Rose Lakel, that there was no *quid pro quo* and no

promise that if she testified agreeably, she would be given favored treatment with regard to criminal proceedings pending against her, the absence of such a "deal" really does not matter in these kinds of cases. It is the jury's ability to assess the credibility of the State's witness that is determinative; and it is the witness's bias, as generated by promises or threats by the State, that must be fully explored. If, because the full extent of the favored treatment given to Rose Lakel was kept from D'Agostino in this case, D'Agostino was not able to engage in a complete cross-examination of the State's principal witness, then his constitutional rights have been violated. It does not matter that the nondisclosure was unintentional or that the State made no explicit promises in exchange for the witness's testimony. "[W]henever a prosecution witness may be biased in favor of the prosecution because of outstanding criminal charges or because of any non-final criminal disposition against him within the same jurisdiction, that possible bias, in fairness, must be known to the jury." Commonwealth v. Evans, 512 A.2d 626, 631 (Pa. 1986). The rationale behind such a holding is simply that "[e]ven if the prosecutor has made no promises, either on the present case or on other pending criminal matters, the witness may hope for favorable treatment from the prosecutor if the witness presently testifies in a way that is helpful to the prosecution. And if that possibility exists, the jury should know about it." Id. at 631-32.

I would hold in this case that the conviction was obtained by use of a "principal witness" who may have been influenced by a hope for benefit or fear of harm from the State, and under conditions in which it appears that full information about the relationship between the prosecution and the witness was not disclosed to the defense. Under these circumstances, I would reverse the judgment of conviction and remand for a new trial.