**137 Nev., Advance Opinion 30**

IN THE SUPREME COURT OF THE STATE OF NEVADA

---

THE STATE OF NEVADA,
Appellant,
vs.
JOHN JOSEPH SEKA,
Respondent.

No. 80925

**FILED**

JUL 08 2021

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY_____
CHIEF DEPUTY CLERK

---

Appeal from a district court order granting a motion for a new trial in a criminal matter. Eighth Judicial District Court, Clark County; Kathleen E. Delaney, Judge.

*Reversed.*

Aaron D. Ford, Attorney General, Carson City; Steven B. Wolfson, District Attorney, and Alexander G. Chen and John T. Fattig, Chief Deputy District Attorneys, Clark County,
for Appellant.

Clark Hill PLLC and Paola M. Armeni, Las Vegas; Jennifer Springer, Salt Lake City, Utah,
for Respondent.

---

BEFORE THE SUPREME COURT, PARRAGUIRRE, STIGLICH, and SILVER, JJ.

OPINION

By the Court, SILVER, J.:

John "Jack" Seka was convicted in 2001 of two counts of murder and two counts of robbery related to the 1998 killings of his boss Peter

21-19533

Limanni and contract worker Eric Hamilton. Both bodies were transported in work vehicles and dumped in remote desert areas. Although substantial circumstantial and physical evidence pointed to Seka as the killer, no physical evidence, aside from fingerprints on a board covering Hamilton's body, connected Seka to the desert locations where the bodies were found. Genetic marker analysis (DNA) testing at the time of trial could only exclude Seka from DNA collected from a few pieces of evidence. But DNA testing performed in 2018 and 2019 both excluded Seka from DNA on several pieces of evidence and discovered other DNA profiles on some of that evidence. In 2020, based on these new DNA test results, the district court granted a new trial.

NRS 176.515(1) allows a court to grant a new trial within two years after the original trial "on the ground of newly discovered evidence." But NRS 176.09187(1) allows a defendant to move for a new trial at any time where DNA test results are "favorable" to the defendant. We have never addressed what constitutes "favorable" results under that statute. We now clarify that, consistent with *Sanborn v. State*, 107 Nev. 399, 406, 812 P.2d 1279, 1284-85 (1991), new DNA test results are "favorable" where they would make a different result reasonably probable upon retrial. We conclude that the new evidence here fails to meet this requirement, and we reverse the district court's order granting a new trial.

I.

Peter Limanni established Cinergi HVAC, Inc., in May 1998. The business, located at 1933 Western Avenue in Las Vegas, was funded by investors Takeo Kato and Kaz Toe. Limanni hired his friend Jack Seka to help out with the business, paying Seka in cash. Limanni and Seka lived

SUPREME COURT
OF
NEVADA

(O) 1947A

together at Cinergi.[1]  Limanni typically drove the business's brown Toyota truck, while Seka drove one of the company vans.

The business did poorly, and by the beginning of that summer Kato and Toe wanted their investment returned.  Instead, Limanni decided to open a cigar shop at Cinergi's address, and he, along with Seka, began building a wooden walk-in humidor to display the cigars.

Limanni also began dating Jennifer Harrison that August.  He told Harrison and others that he could disappear and become a new person.  Limanni closed his bank accounts on November 2 after removing large sums of money.  On November 4, Limanni visited Harrison at her home and spoke of his plans for the cigar shop.  As he left, he mentioned calling Harrison the next day and going with her to lunch.  That same day, Limanni picked Seka up from the airport and drove him back to Cinergi after Seka returned from visiting family back East.

The morning of November 5, Harrison was unable to reach Limanni.  Harrison drove to Cinergi and arrived around noon to find Seka passed out on the floor and a girl on the couch.  A few hundred dollars in cash was lying on the desk.  Limanni's clothes, belt, and shoes were in his room, but Limanni was not there.  Harrison also found a bullet cartridge on the floor, which did not look as though it had been fired.  Limanni's dog, whom Limanni took everywhere, was also at Cinergi.  At the time, Harrison believed Limanni had simply disappeared, as he'd previously threatened to do.  Seka dissuaded her from filing a missing person report.

On the morning of November 16, a truck driver noticed a body lying in a remote desert area between Las Vegas Boulevard South and the

---

[1]According to Seka, no one else lived with them at the business.

 

I-15, south of what is now St. Rose Parkway. The body, a male, was located approximately 20 feet off Las Vegas Boulevard South, in the middle of two tire tracks that made a half circle off and back onto that road. He had been shot through the back, in the left flank, and in the back of the right thigh with a .357 caliber gun. There was no evidence of skin stippling, suggesting the bullets were not fired at a close range. The victim was wearing a "gold nugget" ring and had a small laceration on his right wrist. Seven pieces of lumber had been haphazardly stacked on the body. The victim had a piece of paper in his pocket with the name "Jack" and a telephone number. Detectives learned the victim was Eric Hamilton, who struggled with drug use and mental illness and had come from California to Nevada for a fresh start. According to his sister, Hamilton had been doing construction work for a local business owner. Detectives determined Hamilton had died sometime in the prior 24 hours. They traced the telephone number in his pocket to Cinergi.

Notably, a cigarette butt was found a few feet from the body. A Skoal tobacco container, a second cigarette butt, a beer bottle, and a second beer bottle were found at varying distances of approximately 15 to 120 feet away from the body. All of the items were located in the desert area within several yards of Las Vegas Boulevard South.

The following day, a break-in was reported at 1929 Western Avenue, a vacant business next door to Cinergi. The front window was broken, and the glass and carpet were bloodied. There were also blood drag marks, and three bullets and bullet fragments. A bloodied dark blue jacket contained bullet holes that matched Hamilton's injuries. A baseball hat and a "gold nugget" bracelet were also found at the scene. An officer checked the perimeter that morning and looked into the communal dumpster, which

SUPREME COURT
OF
NEVADA

(O) 1947A

4

contained only a few papers. A nearby business owner indicated the dumpster had been recently emptied.

While the police were investigating 1929 Western, Seka drove up in Cinergi's Toyota truck—Limanni's work vehicle. The truck had been recently washed. Officers talked to Seka, who seemed nervous. Seka told them he worked at Cinergi with Limanni, who was in the Reno area with his girlfriend. Officers asked Seka if they could check inside Cinergi to see if anyone was injured, and Seka agreed. Officers became concerned after spotting a bullet on the office desk and some knives, and they handcuffed Seka and searched the business. In the room being remodeled as a humidor, they found lumber that matched the lumber covering Hamilton's body. They also found a bullet hole in the couch, a .32 cartridge bullet in the toilet, and both .357 and .32 bullets in the ceiling. Officers looked above the ceiling tiles and found a wallet containing Limanni's driver's license, social security card, and birth certificate as well as credit cards and a stolen purse. In a garbage can inside, they found Limanni's photographs alongside some papers and personal belongings. The officers eventually left to go to lunch, unhandcuffing Seka and leaving him at Cinergi. They were gone for a little over an hour.

When the officers returned, they noticed that the bullet that had been on the desk was missing. Seka opined that the building owner had removed it, but the building owner denied having been inside or having touched the bullet. Officers also checked the dumpster again and this time saw the bottom of the dumpster was now filled with clothing, papers, cards, and photographs, some of it in Limanni's name. Some of the items were burnt. Detectives also investigated and impounded the Toyota truck Seka

SUPREME COURT
OF
NEVADA

(O) 1947A

5

drove up to the premises with, which had apparent blood inside of the truck and on a coil of twine inside.

Officers Mirandized Seka, who agreed to be interviewed at the detective bureau. Seka told the detective that Limanni had vanished weeks ago and that Seka was trying to keep up the business, alone. He described a man named "Seymore" who had done odd jobs for Cinergi and claimed he last spoke to Seymore in late October, when Seymore called Seka's cell phone to ask about doing odd jobs. Detectives determined "Seymore" was Hamilton. The detective interviewing Seka told Seka he was a murder suspect, at which point Seka "smiled" and stated, "You're really starting to scare me now. I think you'd better arrest me or take me home. Do you have enough to arrest me right now?" The detective explained that officers would wait until the forensic evidence returned before making an arrest, and then he drove Seka back to Cinergi.

Seka told detectives he had a dinner appointment and needed a vehicle. Detectives explained they were impounding the Toyota truck but told Seka that he could take a company van. At the time, there were two vans: a solid white van and a van with large advertising decals. Detectives handed Seka the keys to the solid white van, and Seka made a comment that suggested he would rather take the decaled van. Becoming suspicious, detectives searched the decaled van and found blood droplets in the back. They allowed Seka to leave in the solid white van; Seka promised to return following dinner. But Seka did not return. Instead he told property manager Michael Cerda he was leaving and asked Cerda to look after the dog. Seka also asked Harrison if he could borrow her car, telling her he needed to leave town to avoid prosecution for murder and that he was "going

SUPREME COURT
OF
NEVADA

(0) 1947A

6

underground." Eventually, Seka returned to the East Coast to stay with his girlfriend.

Limanni's body was discovered December 23 in California, approximately 20 feet from Nipton Road in an isolated desert area near the Nevada border. Limanni was wearing only boxer shorts. Faded tire tracks showed a vehicle had driven away from the body. The body's condition indicated Limanni had been dead for several weeks. He had been shot at least 10 times with a .32 caliber gun. Seven shots were to the head.

Seka was arrested in Pennsylvania in March 1999. The murder weapons, a .32 caliber firearm and a .357 caliber firearm, were never found.

## II.

The State charged Seka with two counts of murder with use of a deadly weapon (open murder) and two counts of robbery with use of a deadly weapon, and filed notice of its intent to seek the death penalty. The case went to trial from February 12 to March 1, 2001. The State's theory of the case was that Seka killed Limanni after learning Limanni was going to abandon the business and betray Seka by leaving him alone to deal with the fallout of the failed business. The State argued Hamilton may have either helped Seka or simply been an innocent bystander who was shot as he attempted to flee.

Some of Seka's friends testified Limanni treated Seka well, but Jennifer Harrison recalled Limanni treating Seka poorly and testified that Limanni always referred to Seka as "his nigger." Harrison also explained Limanni controlled Seka's access to money and often ordered Seka to run menial errands. Seka once told Harrison that Limanni's anger and name-calling was "just the tip of the iceberg." Harrison further testified that she called Seka the morning Limanni disappeared, and Seka reported Limanni had left early that morning. Harrison thought Seka seemed "really down,"

SUPREME COURT
OF
NEVADA

(O) 1947A

and Seka told Harrison that he had just discovered his girlfriend was cheating on him. But Seka's girlfriend testified that nothing had happened between them during Seka's visit and that Seka had not been upset with her.

Notably, Seka's friend of 12 years, Thomas Cramer, testified to once overhearing Limanni treat Seka poorly during a phone call. Then, during the time that Seka was hiding from being apprehended by the police for murder, Cramer asked Seka about the rumor that he killed Limanni. Seka responded saying, "They didn't even find the body." On another occasion, Seka threatened Cramer by saying, "Do you want me to do to you what I did to Pete Limanni?" Finally, Cramer testified Seka told him that Limanni had come at Seka with a gun, and Seka had wrested the gun from Limanni and shot him in self-defense. During cross-examination by Seka's attorneys, Cramer was impeached by acknowledging to the jury that he had been treated for alcohol addiction and depression, had been diagnosed with major depressive disorder and PTSD, was on medication, and admitted that he had previously been treated at mental hospitals. He also admitted to being upset with Seka, who was friends with Cramer's girlfriend and helped her secure a restraining order against Cramer. Seka was also instrumental in having Cramer put into a mental institution.

During trial, the evidence established that a .32 caliber firearm was used to kill Limanni, while a .357 caliber firearm was used to kill Hamilton. Both types of ammunition were found at Cinergi, where Seka had been living and working. The evidence further suggested that only one gun had been used at each shooting. The evidence also showed Limanni's body had been transported in the decaled company van, while Hamilton's body had been transported in the bed of the brown Toyota pickup truck.

The tires on the Toyota truck made impressions similar to the tire tracks near Hamilton's body. DNA from a glass shard further established that Hamilton was the victim killed at 1929 Western, the business next to Cinergi. Of the wood covering Hamilton's body, two pieces bore Seka's prints, and one bore Limanni's. Beer bottles in Cinergi's trash yielded both Seka's and Hamilton's prints. But prints on the beer bottle found in the desert area near Hamilton's body did not match Seka, and DNA evidence from Hamilton's fingernails excluded Seka as a contributor. The State did not argue that Seka dropped the trash found near Hamilton's body.

During closing arguments, the State theorized that Seka killed Limanni after learning Limanni was going to abandon the business and betray Seka by leaving him alone to deal with the fallout of the failed business. The State argued Hamilton may have either helped Seka or simply been an innocent bystander who was shot as he attempted to flee. But defense counsel theorized that Cinergi's investors, who had lost a substantial sum on Cinergi and disliked Limanni, came to the business after Seka had moved out, took Limanni out into the desert and killed him, and also shot Hamilton, an innocent bystander. Defense counsel argued that no evidence implicated Seka in the murders, that Seka had no motive to kill the victims, and that the State's case against Seka was not believable. Defense counsel contended Limanni was a con man and highlighted discrepancies and weaknesses in the circumstantial evidence to undermine the State's case and suggest alternative theories.[2] Relevant here, defense

---

[2]For example, defense counsel argued that Cinergi investors lied to detectives; Cramer's testimony of Limanni gurgling blood was inconsistent with the lack of blood at Cinergi; Cramer suffered from mental illness and developed the story to get Seka away from Cramer's girlfriend; Cramer

SUPREME COURT
OF
NEVADA

(O) 1947A

9

counsel pointed out, through photographs in evidence showing Seka smoking, that the cigarette butts found near Hamilton's body were a different kind than those Seka smoked and therefore did not tie Seka to the crime.

The jury found Seka guilty of first-degree murder with use of a deadly weapon and robbery in regard to Hamilton, and of second-degree murder with use of a deadly weapon and robbery as to Limanni, but the jury deadlocked at the penalty phase. Seka thereafter stipulated to life imprisonment without the possibility of parole to avoid the death penalty.

III.

Seka filed a direct appeal in May 2001, and we affirmed the conviction. Seka thereafter petitioned for a writ of habeas corpus, which the district court denied, and we affirmed the denial.

In 2017, Seka requested a DNA test of evidence collected at Hamilton's remote desert crime scene and the surrounding area. Seka argued that had items collected by detectives yielded exculpatory evidence at trial, he would not have been convicted, particularly in light of the evidence implicating Cinergi investors and undermining Cramer's testimony of Seka's confession. The district court granted Seka's request, and the following items were tested for DNA in late 2018 and early 2019:

(1) Two cigarette butts found near Hamilton's body. Testing in 1999 failed to find any testable DNA. Testing in 2018 failed to obtain DNA

---

changed his story between the preliminary hearing and trial; testimony suggested other people had access to and frequented Cinergi; Seka was too small to have singlehandedly put Limanni's 200-pound corpse in the vehicle, drive him to the state line, and bury him; Seka would not have left his own phone number in Hamilton's pocket had he killed Hamilton; etc.

from one cigarette butt, but a partial profile from the second cigarette butt did not match either Hamilton or Seka, and both were excluded as contributors.[3]

(2) Hamilton's fingernail clippings. Testing in 1998 excluded Seka as a contributor to the DNA from the clippings on one hand. The 2018 DNA testing likewise excluded Seka as a contributor to the DNA from the clippings on both hands but found possible DNA from another person, although it was such a small amount of DNA[4] that it could have been transferred from something as benign as a handshake or DNA may not have actually existed.

(3) Hairs found underneath Hamilton's fingernails. In 1998, the DNA profile included Hamilton and excluded Seka. The 2018 testing likewise found only Hamilton's DNA on the hairs.[5]

(4) The Skoal tobacco container found near Hamilton's body. The 2019 testing showed two contributors, but Hamilton and Seka were excluded. The forensic scientist explained that an old technique used to find latent fingerprints, "huffing," may have been used on this item and may have contaminated the DNA profile. Moreover, because at the time of the original trial the State did not have the capability to test for "touch DNA," the scientists may not have worn gloves while examining the evidence, or

---

[3]The State put the results from the second cigarette butt into the CODIS system, a database of DNA profiles and other samples from various arrestees and offenders, but did not find any matches.

[4]The forensic scientist explained that the test results showed 99 percent of the DNA coming from Hamilton as the DNA contributor and 1 percent of the DNA coming from an unknown contributor.

[5]Statistically, it was 3.24 billion times more likely that the DNA was Hamilton's than that of a different, unknown contributor.

crime scene analysts may have used the same gloves and same fingerprint dusting brush while processing evidence, thereby adding to or transferring DNA.

(5) A beer bottle found off the road in the desert in the vicinity of Hamilton's body. The 2019 DNA testing excluded Hamilton and Seka but included a female contributor. As with the Skoal tobacco container, the forensic scientist testified that huffing and other outdated procedures may have contributed unknown DNA onto the item.

(6) The baseball hat found at 1929 Western. The 2019 DNA testing showed three contributors, including Hamilton, but the results were inconclusive as to Seka. The forensic scientist explained the cap was kept in an unsealed bag along with a toothbrush also found at 1929 Western. Critically, he further testified that it was impossible to know how many times the bag had been opened or closed during the jury trial or whether the hat had been contaminated, such as by jurors holding it or talking over it.

Based on these DNA results, Seka moved for a new trial, arguing the new results both exculpated Seka and implicated an unknown person in the crimes. The district court found that "[t]he multiple unknown DNA profiles are favorable evidence" and granted the motion.

Arguing the new DNA evidence does not warrant a new trial, the State appeals.

IV.

NRS 176.515(1) allows a court to grant a new trial "on the ground of newly discovered evidence." That statute generally requires a

SUPREME COURT
OF
NEVADA

(O) 1947A

12

defendant to move for a new trial within two years of the verdict.[6] NRS 176.515(3). An exception applies where the newly discovered evidence comes from DNA testing, in which case the defendant may move for a new trial at any time if the evidence is "favorable" to the defendant. NRS 176.09187(1). But NRS 176.09187 does not define the term "favorable." We review the district court's decision to grant a new trial for an abuse of discretion. *Sanborn v. State*, 107 Nev. 399, 406, 812 P.2d 1279, 1284 (1991). But we review issues involving statutory interpretation de novo. *Weddell v. H2O, Inc.*, 128 Nev. 94, 101, 271 P.3d 743, 748 (2012).

We have never addressed what makes DNA evidence "favorable" under NRS 176.09187(1) or the circumstances under which new DNA evidence warrants a new trial. At the outset, we note "courts have uniformly held that the moving party bears a heavy burden" on a motion for a new trial on newly discovered evidence. *INS v. Abudu*, 485 U.S. 94, 110 (1988). And over a century ago we set forth elements for determining whether newly discovered evidence in general warrants a new trial. *See Sanborn*, 107 Nev. at 406, 812 P.2d at 1284-85 (citing *McLemore v. State*, 94 Nev. 237, 239-40, 577 P.2d 871, 872 (1978)); *see also Oliver v. State*, 85 Nev. 418, 424, 456 P.2d 431, 435 (1969); *Whise v. Whise*, 36 Nev. 16, 24, 131 P. 967, 969 (1913). In *Sanborn* we explained

> the evidence must be: newly discovered; material to
> the defense; such that even with the exercise of

---

[6]We note that generally the district court judge who presided at trial should be the judge who hears and determines the motion for a new trial whenever possible, as the trial judge is in the best position to determine whether new evidence is "favorable" to the defendant, *see* NRS 176.09187. We encourage the district courts to be exceptionally mindful of this and be very familiar with the trial record if the trial judge is unavailable to preside over a motion for a new trial.

reasonable diligence it could not have been discovered and produced for trial; non-cumulative; such as to render a different result probable upon retrial; not only an attempt to contradict, impeach, or discredit a former witness, unless the witness is so important that a different result would be reasonably probable; and the best evidence the case admits.

107 Nev. at 406, 812 P.2d at 1284-85. As these factors are conjunctive, *id.*, a new trial must be denied where the movant fails to satisfy any factor.

We interpret NRS 176.09187's mandate that new evidence be "favorable" in concert with this long-honored caselaw.[7] *Cf. First Fin. Bank N.A. v. Lane*, 130 Nev. 972, 978, 339 P.3d 1289, 1293 (2014) ("This court will not read a statute to abrogate the common law without clear legislative instruction to do so."); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 318-19 (2012) (addressing the presumption that a statute will not be read to alter the common law absent the statute's clear intent to do so). We conclude that to warrant a new trial, the "favorable" DNA evidence must do more than merely support the defendant's position or possibly alter the outcome of trial. *See Whise*, 36 Nev. at 24, 131 P. at 969 ("[I]t is not sufficient that the new evidence, had it been offered at trial, *might* have changed the judgment." (emphasis added)). The new DNA evidence must be material to a key part of the prosecution or defense, or so significant to the trial overall, such that had it been introduced at trial, a different result would have been reasonably probable. *See id.* ("Newly discovered evidence, to have any weight in the consideration

---

[7]Seka acknowledges the term "favorable" in NRS 176.09187 is synonymous with *Sanborn*'s standard.

of a trial court, must be material or important to the moving party . . . such as to render a different result reasonably certain.").

The weight of the new DNA evidence will ultimately depend on the facts and circumstances of each individual case, including the sufficiency of the evidence adduced at trial. *Cf. State v. Parmar*, 808 N.W.2d 623, 631-34 (Neb. 2012) (comparing and contrasting cases where the new DNA evidence "probably would [or would not] have produced a substantially different result if the evidence had been offered and admitted at . . . trial"); *see also Walker v. State*, 113 Nev. 853, 873, 944 P.2d 762, 775 (1997) (concluding evidence would support the defendant's argument but ultimately was not of a caliber that would likely lead to a different result). But we stress that newly discovered DNA evidence cannot be considered favorable where it does not undermine the jury's verdict and is cumulative under the facts of the case.[8] *Cf. Cutler v. State*, 95 Nev. 427, 429, 596 P.2d 216, 217 (1979) (concluding cumulative evidence did not warrant a new trial); *Bramlette v. Titus*, 70 Nev. 305, 312, 267 P.2d 620, 623-24 (1954) (same). Newly discovered evidence is also not favorable where it has no relevance to the circumstances of the crime. *Cf. Mortensen v. State*, 115 Nev. 273, 287, 986 P.2d 1105, 1114 (1999) (explaining the new evidence did not relate to the circumstances of the murder and did not inculpate a new

---

[8]Although *LaPena v. State*, Docket No. 73826 (Order of Affirmance, October 11, 2018), is unpublished, it is also instructive here. There, we considered newly discovered DNA evidence that impeached a key witness's testimony of the murder but concluded the DNA evidence did not warrant a new trial where the witness's testimony had been impeached at trial by the medical examiner. *Id.* Moreover, an additional, unknown DNA profile on the cord used to strangle the victim did not warrant a new trial where it merely showed that an unknown person had handled the cord at some unknown time. *Id.*

SUPREME COURT
OF
NEVADA

(O) 1947A

suspect or exculpate the defendant). Nor is newly discovered evidence favorable where it impeaches a witness without contradicting or refuting any of the trial testimony supporting the verdict. *Cf. id.* at 288, 986 P.2d at 1114 (concluding introducing the evidence "would simply be an attempt to discredit" the witness where that evidence did not contradict or refute the witness's trial testimony). Likewise, the newly discovered evidence will not be favorable if it merely goes to an issue that was fully explored at trial and is not sufficiently material to make a different verdict probable. *Cf. D'Agostino v. State*, 112 Nev. 417, 423-24, 915 P.2d 264, 267-68 (1996) (concluding newly discovered evidence about benefits offered to a witness did not warrant a new trial where the witness's criminal background and cooperation with police had been explored at trial); *see also Simmons v. State*, 112 Nev. 91, 103, 912 P.2d 217, 224 (1996) (concluding newly discovered evidence that was relevant to the question of where the victim was killed did not warrant a new trial where substantial evidence already pointed to the murder scene).

With the exception of Seka's fingerprints on the wood stacked on Hamilton's body in the desert, the State at the 2001 trial presented no other physical evidence from where the body was found to tie Seka to the murders, instead relying on the circumstantial evidence. The DNA testing in 2018 and 2019 produced six new pieces of DNA evidence,[9] taken from Hamilton's fingernail clippings and hair under his fingernails; from a tobacco container, beer bottle, and cigarette butt found in the vicinity of his

---

[9]Although the State argues the evidence is not "new" because similar evidence was presented at trial, we note the DNA tests performed in 2018 and 2019 were not available at the time of trial and the new DNA tests were able to find additional profiles, making those test results newly discovered evidence that could not have been discovered at the time of trial.

body; and from a hat found at Hamilton's murder scene. As set forth in detail below, although some of the evidence newly tested yielded other, unknown profiles, none of it exculpated Seka of the murders, necessarily implicated another suspect in the crimes, or otherwise materially supported his defense. Critically, too, the new DNA evidence from the scene where Hamilton's body was dumped was cumulative of the evidence adduced at trial as no DNA evidence inculpated Seka to that scene in 2001 and the new DNA results likewise do not inculpate Seka to that crime scene. Moreover, the new DNA evidence did not contradict or refute the totality of the evidence supporting the verdict. Thus, for the following reasons, the new DNA evidence was not favorable to the defense within the meaning of NRS 176.09187.[10]

First, as to the hairs found underneath Hamilton's fingernails, updated DNA testing showed only that those were Hamilton's hairs, mirroring the DNA results at the time of trial, and is cumulative here. As to the DNA collected from Hamilton's fingernail clippings, the bullet and lack of stippling evidence shows Hamilton was shot in the back from a distance, seemingly as he fled from the killer. There is no evidence of a struggle, reducing the evidentiary value of any newly discovered DNA under his fingernails.[11] Moreover, the fingernail clippings provided so little

---

[10]Seka also argues that a number of fingerprints taken from items at Cinergi and evidence around Hamilton's body were not tested and contends those fingerprints may have implicated another perpetrator. Because the narrow question before us is whether the new DNA evidence supports the granting of a new trial, we do not address the untested fingerprints.

[11]Although Seka distinguishes between the blood tested at trial and the epithelial cells tested in 2018, this distinction is not materially relevant

DNA that it is possible another profile might not actually exist, further reducing the evidence's already dwindling value.

The beer bottle, cigarette butt, and Skoal tobacco container were spread along the shoulder of a major road at increasing distances of up to 120 feet from Hamilton's body and may well have been nothing more than trash tossed by drivers or pedestrians in the desert area. The State did not argue at trial that Seka dropped those items, and to the extent DNA testing yielded unknown DNA profiles, the new DNA evidence shows only that an unidentified person touched those items at some unknown time.[12] Thus, any link to the killer is speculative at best. Moreover, testing at the time of trial used outdated techniques and procedures that may have contaminated any DNA on those items, further calling into question their evidentiary value. And the jury was already aware that the cigarette butts found near Hamilton were different than those that Seka smoked, making the new DNA test results on that evidence cumulative.

Finally, the DNA on the hat has no probative value here. Although that testing produced other profiles, it was inconclusive as to Seka, and, moreover, the hat was not properly sealed and may have been contaminated before and during trial, including by the jury, making the presence of additional DNA profiles of no relevance under these circumstances.

Thus, at most this new DNA evidence showed only that another person may have come in contact with some of those items. It does not

---

under the facts here, where Seka was excluded as a contributor on both types of evidence.

[12]Notably, too, the beer bottle produced a female profile, and Seka has never argued that the killer was a woman.

materially support Seka's defense, as it is cumulative of the evidence already adduced at trial excluding Seka as a contributor to DNA profiles or fingerprint evidence. The State did not rely upon any of these items at trial to argue Seka's guilt, further reducing the evidentiary value of the new DNA evidence, and, moreover, nothing supports that the killer actually touched any of the evidence tested in 2018 and 2019. Nor did any of the new DNA evidence implicate another killer or exonerate Seka under the totality of all of the evidence adduced in this case.

Importantly, none of this new evidence from Hamilton's crime scenes affects the evidence supporting the guilty verdict, where at trial no physical evidence of DNA tied Seka to the crime scenes and the State's case was completely circumstantial. It is clear from the circumstantial evidence that Hamilton was killed next door to Seka's business and residence on Western Avenue, and his body was transported and dumped in a remote desert area. The .357 bullet casings found at Cinergi were consistent with the caliber of gun that was used to shoot Hamilton next door, and Hamilton's blood was found at 1929 Western and in the truck Seka was driving the morning after Hamilton's body was discovered. Moreover, the truck's tire impressions were similar to the tire tracks found near Hamilton's body—tracks that drove off and back on the road consistent with the body being quickly dumped. Although crime scene analysts routinely gather items found around a body in hopes of implicating a killer, under these particular circumstances—where the body was driven to a remote area and dumped off the side of the road—the random trash items in the desert with unknown DNA contributors do not undermine the other evidence against Seka.

Supreme Court
of
Nevada

(O) 1947A

Moreover, the physical and circumstantial evidence overwhelmingly supported a guilty verdict as to both murders. Limanni was killed by a .32 caliber weapon, and Hamilton was killed by a .357 caliber weapon—and both types of ammunition were found at Cinergi, where Seka worked and lived. Hamilton was killed next door to Cinergi, and the bullet fragments suggest Limanni was killed at Cinergi, a supposition corroborated by Seka's own confession to Cramer. Both Limanni's and Hamilton's bodies were dumped off a road in the desert. Limanni's body was transported in the company van Seka preferred to drive before Limanni disappeared, and Hamilton's body was transported in the Toyota truck that Seka was driving after Limanni disappeared—a truck that had been cleaned shortly before officers responded to Hamilton's murder scene. Hamilton had a note with Seka's name and business number in his pocket, and his body was covered in wood taken from Cinergi that contained Seka's fingerprints. Beer bottles found in the garbage the day after Hamilton's body was discovered had both Hamilton's and Seka's fingerprints, suggesting the two had been drinking at Cinergi just prior to the altercation at 1929 Western. Limanni's belongings were hidden at Cinergi, which Seka had access to after Limanni disappeared. Limanni made plans with Harrison for the day he went missing, and Seka was the last person to see Limanni alive. Specifically, Harrison testified that when Limanni left her home the night before he disappeared, the couple discussed calling each other and going to lunch the next day. But when Harrison was unable to reach Limanni the following morning and went to Cinergi searching for Limanni, she found a large amount of cash (notably, Limanni had just withdrawn his money from his bank accounts), all of Limanni's clothing, Limanni's dog (whom Limanni took everywhere), a bullet on the floor, and

SUPREME COURT
OF
NEVADA

(O) 1947A

Seka—but not Limanni. Seka—whom Limanni had picked up at the airport the prior day—told Harrison that Limanni had left early that morning. And when Limanni failed to return, Seka discouraged Harrison from filing a missing person report. All of this evidence points to Seka as the killer.

Further, Seka's statements were contradicted by other evidence, undermining his truthfulness and, by extension, further implicating him in the crimes. For example, Seka claimed that Hamilton had worked at Cinergi in mid-October, but other evidence established Hamilton moved to Las Vegas in late October or early November. When officers searching Hamilton's murder scene asked Seka about Limanni, Seka told them that he believed Limanni was in the Reno area with his girlfriend, even though Seka knew this was untrue from his conversations with Harrison. Officers noticed a bullet on a desk in Cinergi when they first arrived, yet it mysteriously went missing after Seka arrived at the scene. Thereafter, Seka suggested to the police that the bullet's disappearance might be due to the building owner removing it, yet the owner confirmed to the police when questioned that he had not been inside the building when the bullet went missing. And when Harrison noticed Seka's upset demeanor the morning Limanni disappeared, Seka blamed his mood on his girlfriend, even though his girlfriend later testified nothing had happened between them that would have upset Seka.

Finally, there was substantial evidence of Seka's guilty conscience. Officers discovered someone had attempted to hide Limanni's personal papers in Cinergi's ceiling, and Seka had access to Cinergi after Limanni went missing. Circumstances suggested Seka removed the bullet on the desk that initially caught the officer's attention. A .32 caliber bullet was found in the toilet at Cinergi, as if Seka, the person living and working

SUPREME COURT
OF
NEVADA

(O) 1947A

21

at Cinergi, had attempted to dispose of incriminating evidence down the toilet. The dumpster behind the business had been emptied shortly before officers arrived to investigate Hamilton's murder scene, and an officer observed that it was nearly empty that morning, yet by afternoon after Seka arrived at the location, that same dumpster was filled with Limanni's personal belongings and papers, some of them burned, even though officers were at that time only searching for clues as to Hamilton's death and were unaware of Limanni's disappearance. After Seka learned he was a suspect in Hamilton's murder, Seka attempted to leave the scene in the decaled van that held evidence of Limanni's murder. Seka told officers he would return to Cinergi after dinner, but instead Seka fled the state. Seka also told Harrison he was fleeing to avoid prosecution. And Seka made incriminating statements to his longtime friend, Cramer, and eventually confessed Limanni's murder to Cramer.[13] All of this evidence ties Seka to Limanni's death and ultimately ties him to Hamilton's death as well.

Whether newly discovered DNA evidence will warrant a new trial in a murder case is a fact-intensive inquiry. Under different facts, DNA evidence such as that discovered here could warrant a new trial. But the newly discovered DNA evidence was cumulative in this case, and the unknown DNA profiles on miscellaneous desert debris cannot, under these facts, be considered favorable. And although Seka points to discrepancies and weaknesses in the evidence adduced at trial and to speculative evidence that disgruntled investors were more likely suspects than himself, the

---

[13]Seka argues on appeal that Cramer's testimony was not credible. However, the defense attacked Cramer's credibility at trial and the jury nevertheless convicted Seka, and we do not reweigh the evidence on appeal. *Clancy v. State*, 129 Nev. 840, 848, 313 P.3d 226, 231 (2013).

totality of all of the physical and circumstantial evidence adduced at trial nevertheless pointed to Seka and supports the jury's verdict.

Accordingly, the new DNA evidence does not make a different outcome reasonably probable here and is not "favorable" to the defense as necessary to warrant a new trial.[14] We therefore conclude the district court abused its discretion by granting Seka a new trial based on the newly discovered DNA evidence, and we reverse the district court's decision.

V.

Under NRS 176.09187(1), a party may move for a new trial at any time where DNA test results are "favorable" to the moving party. Consistent with *Sanborn v. State*, 107 Nev. 399, 406, 812 P.2d 1279, 1284-85 (1991), we hold that new DNA test results are "favorable" where they would make a different result reasonably probable upon retrial. Because the new evidence here fails to meet this standard, we reverse the district court's order granting a new trial.

_____, J.
Silver

We concur:

_____ J.
Parraguirre

_____, J.
Stiglich

---

[14]Notably, too, Seka was *also* convicted of robbing the victims, and the jury therefore believed beyond a reasonable doubt that Seka not only murdered Limanni and Hamilton, but robbed them as well.

SUPREME COURT
OF
NEVADA

(O) 1947A

23